Paine, J.
—This case comes before me upon a writ of habeas corpus, issued to the respondent, requiring him to have the bodies of eight colored persons, lately taken from the steamer City of Richmond, and now confined i'n a house in this city, before me, together with the cause of their imprisonment and detention.
The respondent has returned to this writ, that said eight colored persons are the property of his wife, Juliet Lemmon, who has been their owner for several years past, she being a resident of Virginia, a slaveholding state, and that by the constitution and laws of that state they have been,, and still are, bound to her sei'vice as slaves ; that she is now, with her said slaves or property, in transitu from Virginia to Texas, another slaveholding state, and by the constitution and laws of Which, she would' be entitled to said slaves and to their service ; that she never had any intention of bringing, and did not bring them into this state to remain or reside, but was passing through the harbor of New York, on her way from Virginia to Texas, when she was compelled by necessity to touch or land, without intending to remain longer than was necessary. And she insists that said persons are not free, but are slaves as aforesaid, and that she is entitled to their possession and custody.
*707 To this return the relator has put in a general demurrer.
I certainly' supposed, when this case was first presented tome, that, as there could be no dispute about the facts, there would be no delay or difficulty in disposing of it. But, upon the argument, the counsel for the respondent cited several cases which satisfied me that-this case could not be decided, until those cases had been carefully examined.
The principle which those cases tend more or less forcibly to sustain, is, that if an owner of slaves is merely passing from home with them, through a free state, into another slave state, without any intention of remaining, the slaves, while in such free state, will not be allowed to assert their freedom. As that is precisely the state of facts constituting this case, it becomes necessary to inquire whether the doctrine of those cases can be maintained upon general principles, and whether the law of this-state does not differ from the laws of those states where the-decisions were made.
I shall first consider whether. those cases can be sustained upon general principles”.
The first case of the kind which occurred, was that of Sew-all’s slaves, which was decided in Indiana, in 1829, by Judge Morris, and will be found reported in 3 Am. Jurist, 404. The return to the habeas corpus stated that Sewall resided in Virginia, and owned and held the slaves under- the laws of that state; that he was emigrating with them to Missouri,- and on his way was passing through Indiana, when he was served with the habeas corpus.
It, however, appeared on the hearing, that Sewall was not going to Missouri to reside, but to Illinois, a state whose • laws do not allow of slavery. The judge for this reason discharged the slaves. • This case, therefore, is not in point, and would be entirely irrelevant to the present, were it not for a portion off the judge's opinion, which was not called for by the case before him, but applies directly to the case now before me.
“By the law,” he says, “of nature and of nations, (Vattel, 160,) and the necessary and legal consequences resulting from the civil and political relations subsisting between the citizens as well as the states of this Federative Republic, I have no doubt but the citizen of a slave state has a right to pass, upon business *708 or pleasure, through any of the states, attended by his slaves or servants; and while he retains the character and rights of a citizen of a slave state, his right to retain his slaves would be unquestioned. An escape from the attendance upon the person of his master, while on a journey through a free state, should be considered as an escape from the state- where the master had a right of citizenship, and by the laws of which the service of the slave was due. The emigrant from one state to another might be considered prospectively as the citizen or resident of the state to which he was removing ; and should be protected in the emjoyment of those rights he acquired in the state from which he emigrated, and which are recognised and protected by the laws of the state to which he is going. But this right I conceive cannot be derived from any provision of positive law.”
The next case relied upon is Willard v. The People, (4 Scammon’s Rep. 4.61) and which was decided in the state of Illinois in 1843. It was an indictment for secreting a woman óf color owing service to a resident of Louisiana. The indictment was under the 149th section of the Criminal Code, which provides that “ If any person shall harbor or secrete any negro, mulatto, or person of color, the same being a slave, or a servant owing service or labor to any other persons, whether they reside in this state or in any other state, or territory, or district, within the limits and under the jurisdiction of the United States, or shall in any wise hinder or prevent the lawful owner or owners of such slaves or servants from retaking them in a lawful manner, every such person so offending shall be deemed guilty of a misdemeanor, and fined not exceeding five hundred dollars, or imprisoned not exceeding six months.”
It appeared that the woman of color was a slave, owned by a resident of Louisiana, and that, while passing with her mistress from Kentucky to Louisiana through the state of Illinois, she made her escape in the latter state, and was secreted by the defendant.
There were several questions raised in the case which it is unnecessary now to notice. The indictment, which was demurred to, was sustained by the court. The main objection to it was that the section of the code under which it was found was a violation of the sixth article of the constitution of the state *709 of Illinois, which declares that “ neither slavery nor involuntary servitude shall hereafter be introduced into this state, otherwise than in the punishment of crimes, whereof the party shall have been duly convicted.”
The court, in answering this objection, say: “ The only question, therefore, is the right of transit with a slave; for if the slave upon entering our territory, although for a mere transit to another state, becomes free under the constitution, then the defendant in error is not guilty of concealing such a person as is described in the law and in the indictment. The 149th section of the criminal code, for a violation of which the plaintiff is indicted, does most distinctly recognise the existence of the institution of slavery in some of these United States, and whether the constitution and laws of this state have or have not provided adequate remedies to enforce within its jurisdiction that obligation of service, it has provided by this penal sanction, that none shall harbor or conceal a slave within this state, who owes such service out of it. Every state or government may or may not, as it chooses, recognise and enforce this law of comity. And to this extent this state has expressly done so. If we should, therefore, regard ourselves as a distinct and separate nation from our sister states, still, as by the law of nations (Vattel, B. 2, ch. 10, 132,133,134) the citizens of one government have a right of passage through the territory of another peaceably, for business or pleasure, and that too without the latter’s acquiring any right over the person or property (Vattel, B. 2, § 107, 109), we could not deny them this international right without a violation of our duty. Much less could we disr regard their constitutional right, as citizens of one of the states, to all the rights, immunities, and privileges of citizens of the several states. It would be startling indeed if we should deny our neighbors and kindred that common right of free and safe passage which foreign nations would hardly dare deny. The recognition of this right is no violation of our constitution. It is not an introduction of slavery into this state, as was contended in argument, and the slave does not become free by the constitution of Illinois by coming into the state for the mere purpose of passage through it.”
Another case cited by the respondent’s counsel, was the Com *710 monwealth v. Aves (18 Pickering’s Rep. 193). In this case the owner brought her slave with her from New Orleans to Boston, on a visit to her father, with whom she intended to spend five or six months, and then return with the slave to New Orleans. The slave being brought up on habeas corpus, the court ordered her discharge. The case was fully argued, and Chief Justice Shaw closes a very elaborate opinion with these words : “ Nor do we give any opinion upon the case, where an owner of slaves in one state is bona fide removing to another state where slavery is allowed, and in so doing necessarily passes through a free state, or where by accident or necessity he is compelled to touch or land therein, remaining no longer than necessary.”
I have quoted largely from the opinions in these cases, in ■ order that it may be understood clearly what is presented by them as their governing principle. The respondent’s counsel insists it is this: That by the law of nations, an owner of a slave may, either from necessity or in the absence of all intention to remain, pass with such slave through a state where slavery is not legalized, on his way from one slave state to .another, and that during such transit through the free state the slave cannot assert his freedom.
I admit that this is the principle of these cases, and I now propose to consider it. Each case denies that the right of transit can be derived from the provision of the constitution of the United States respecting fugitive slaves, and, where an opinion was expressed, places the right upon the law of nations.
Writers of the highest authority on the law of nations agree that strangers have a right to pass with their property through the territories of a nation. (Vattel, B. 2, ch. 9, §§ 123 to 136. Pufendorf, B. 3, ch. 3, §§ 5 to 10.) And this right, which exists by nature between states wholly foreign to each other, undoubtedly exists, at least as a natural right, between the states which compose our Union.
But we are to look further than this, and to see what the law of nations is when the property which a stranger wishes to take with him is a slave.
The property which the writers on the law of nations speak of is merchandise or inanimate things. And by the law of. nature these belong to their owner. (Institutes of Just., B. 1, *711 t. 2, § 2.) But those writers nowhere speak of a right to pass through a foreign country with slaves as property. On the contrary, they all agree that by the law of nature alone no one can have a property in slaves. And they also hold that, even where slavery is established by the local law, a man cannot have that full and absolute property in a person which he may have in an inanimate thing. (Pufendorf, B. 6, ch. 3, § 7.) It can scarcely, therefore, be said, that when writers on the law of nations maintain that strangers have a right to pass through a country with their merchandise or property, they thereby maintain their right to pass with their slaves.
But .the property or merchandise spoken of by writers on the law of nations which the stranger may take with him, being mere inanimate things, can have no rights ; and the rights of the owner are all that can be thought of. It is, therefore, necessary to look still further and to see what is the state of things, by the law of nature, as affecting the rights of the slave, when an owner finds himself, from necessity, with his slave in a country where slavery is not legalized or is not upheld by law.
It is generally supposed that freedom of the soil from slavery is the boast of the common law of England, and that a great truth, was brought to light in Somerset’s case. This is not so. Lord Mansfield was by no means, so far as the rest of the world is concerned, the pioneer of freedom. Whatever honor there may be in having first asserted that slavery cannot exist by the law of nature, but only by force of local law, that honor among modern nations belongs to France, and, among systems of jurisprudence, to the civil law. The case of Somerset did not occur until the year 1772, and in 1738 a case arose in France in which it was held that a negro slave became free by being brought into France. (13 Causes Célebres, 49.)
But in truth the discovery that by nature all men are free, belongs neither to England nor France, but is as old as ancient Rome ; and the law of Rome repeatedly asserts that all men by nature are free, and that slavery can subsist only by the laws of the state. “ Bella etenim orta sunt, et captivitates secuta e.t servitutes qua sunt naturali juri contraria J jure enim naturali omnes homines ab initio liberi nascebantur.” (Institutes, B. 1, t. 2, s. 2.) “ Jfaturalia quidem jura, qua apud omnes *712 />■' ides perceque servantur, divina quadam procidentia constituía., semper firma atque immutabilia permanent.” (Institutes, E. 1, T. 2, S. 11; Digest, B. 1, T. 1, s. 4 ; B. 1, T. 5, ss. 4, 5.)
The writers on the law of nations uniformly maintain the same principle, viz. that by the law of nature all men are free, and that where slavery is not established and upheld by the law of the state there can be no slaves. (Grotius, B. 2, eh. 22, s. 11; Hobbes De Give, B. 1, ch. 1, s. 3. Pufendorf (Barbeyrac) Droit dela Nature, B. 3 ch. 2, ss. 1, 2, B. 6, ch. 3, s. 2.)
The same writers also hold that by the law of Nature one race of men is no more subject to be reduced to slavery than other races. (Pufendorf, B. 3, ch. 2, s. 8.)
When we are considering a master and slave in a free state, where slavery is not upheld by law, we must take into view all these principles of the law of nature, and see how they are respectively to be dealt with according to that law ; for it will be remembered that the master can now claim nothing except by virtue of the law of nature. He claims under that law a right to pass through the country. That is awarded to him. But he claims in addition to take his slave with him ; but upon what ground ? That the slave is Ms property. By the same law, however, under which he himself claims, that cannot be; fertile law of nature says that there can be no property in a slave.
We must look still further to see what is to be. done with the claims of the slave. There being now no law but the law of nature, the slave must have all his rights under that, as well as the master ; and it is just as much the slave’s right under that to be free as it is the master’s to pass through the country. It is very clear, therefore, that the slave has a right to Ms freedom, and that the master cannot have a right to take him with him.
As the cases cited by the respondent’s counsel all rest the master’s right of transit exclusively upon the law of nations, and admit that he cannot have it under any other law, I have thus followed out that view, perhaps at unnecessary length, in order to see to what it would lead. In order to prevent any misapprehension as to the identity of the law of nature and the law of nations, I will close my observations upon this part of the case with a citation, upon that point, from Vattel. . (Preli *713 minaries, § 6.) “ The law of nations is originally no more than the law of nature applied to nations.”
I ought also to notice here that the respondent’s counsel, upon the authority of the case in Illinois, insisted that this right of transit with slaves is strengthened by that clause in the constitution of the United States which declares that “The citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states.” The case in Indiana, on the other hand, says expressly that the right does not depend upon any positive law.
I think this remark must have found its way into the opinion of the judge who decided the Illinois case without due consideration. I have always understood that provision of the constitution to mean (at least so far as this case is concerned) that a citizen who was absent from his own state, and in some other state, was entitled while there to all the privileges of the citizens of that state. And I have never heard of any other or different meaning being given to it. It would be absurd to say that while in the sister state he is entitled to all the privileges secured to citizens by the laws of all the several states or even of his own state ; for that would be to confound all territorial limits, and give to the states not only an entire community, but a perfect confusion of laws. If I am right in this view of the matter, the clause of the constitution relied upon cannot help the respondent-; for if he is entitled while here to those privileges only which the citizens of this state possess, he cannot hold his slaves.
I must also here notice some other similar grounds insisted upon by the respondent’s counsel.
He cites Vattel (B. 2, ch. 8, s. 81) to prove that the goods of an individual as regards other states are the goods of his state. I have already shown that by the law of nature, about which alone V attel is always speaking, slaves are not goods; and I may add that what Vattel says in the passage to which the counsel refers has no connexion with the right of transit through a foreign country. Besides, in the case from Illinois referred to by respondent’s counsel, the court distinctly declare (Willard v. People, 4 Scammon’s Rep. 471) that they “ cannot see the application to this case of the law of nations in relation *714 to the domicil of the owner fixing the condition of and securing the right of property in this slave, and regarding the slave as a part of the wealth of Louisiana, and our obligation of comity to respect and enforce that right.”
The respondent’s counsel also refers to those provisions of the constitution of the United States which relate to fugitive slaves and to the regulation of commerce among the several states. With regard to the first of these provisions, which the counsel insists recognises and gives a property in slaves, it is sufficient to say, that although the supreme law of the land in respect to fugitive slaves, and as such entitled to unquestioning obedience from' all, it is, so far as everything else is concerned, the same as if there were no such provision in the constitution. This has been so held in cases almost without number, and is held in each of the three cases cited by the respondent’s counsel, and upon which I have before commented.
As for the provision of the constitution in relation to commerce among the states, it has been often held, that notwithstanding this provision, the states have the power impliedly reserved to "them of passing all such laws as may be necessary for the preservation, within the state, of health, order, and the well being of society, or laws which are usually called sanative and police regulations. (Passenger cases, 7 Howard S. C. R. 283; License cases, 5 Ib. 504; Blackbird Creek Marsh Company, 2 Peters, 250; New York v. Miln, 11 Peters, 130; Brown v. State of Maryland, 12 Wheat. 419; Groves v. Slaughter, 15 Peters, 511.) Laws regulating or entirely abolishing slavery, or forbidding the bringing of slaves into a state, belong to this class of laws, and a right to pass those laws is not affected by the constitution of the United States. This view of the subject is taken by the three cases upon which the counsel mainly relies.
It remains for me to consider how far the local law of New York affects this case, and distinguishes it from the cases in Indiana and Illinois.
To go back, first, to the right of transit with slaves, as it is claimed to exist by the natural law: it appears to be settled in the law of nations, that a right to transit with property not only exists, but that, where such right grows out of a necessity created by the vis major, it is a perfect right, and cannot be law *715 fully refused to a stranger. (Vattel, B. 2, ch. 9, s. 123 ; lb. Preliminaries, s. 17 ; Pufendorf, B. 3, ch. 3, s. 9.) In this case it is insisted that the respondent came here with his slaves from necessity, the return having so stated, and the demurrer admitting that statement. It is perfectly true that the demurrer admits whatever is well pleaded in the return. But if the return intended to state a necessity created by the vis major, it has pleaded it badly ; for it only alleges a necessity, without saying what kind of necessity ; and, as it does not allege a necessity created by the vis major, the demurrer has not admitted any such necessity.. Where the right of transit does not spring from the vis major, the same.writers agree that it may be lawfully refused. (Ib.)
But, however this may be, it is well settled in this country, and so far as I know has not heretofore been disputed, that a' state may rightfully pass laws, if it chooses to do so, forbidding the entrance or bringing of slaves into its territory. This is so held even by each of the three cases upon which the respondent’s counsel relies. (Commonwealth v. Ayres, 18 Pick. R. 221; Willard v. the People, 4 Scammon’s Rep. 471; Case of Sewall's Slaves, 3 Am. Jurist, 404.)
The laws of the state of New York upon this subject appear to me to be entirely free from any uncertainty. In my opinion they not only do not uphold or legalize a property in slaves within the limits of the state, but they render it impossible that such property should exist within those limits, except in the single instance of fugitives from labor under the constitution of the United States.
The revised statutes (vol. 1, 656,1st Ed.,) re-enacting the law of 1817, provide that “ no person held as á slave shall be imported, introduced or brought into this state, on any pretence whatever, except in the cases hereinafter specified. Every such person shall be free. Every person held as a slave who hath been introduced or brought into this state contrary to the laws in force at the time shall be free.” (S. 1.)
The cases excepted by this section are provided for in the six succeeding sections. The second section excepts fugitives under the constitution of the United States; the third, fourth, and fifth sections except certain slaves belonging to immigrants, who *716 may continue to be held as apprentices ; the seventh section provides that families coming here to reside temporarily may bring with them and take away their slaves; and the sixth section contains the following provision :
“ Any person not being an inhabitant of this state, who shall be travelling to or from, or passing through this state, may bring with him any person lawfully held by him in slavery, and may take such person with him from this state ; but the person so held in slaver}' shall not reside or continue in this state more than nine months ; and if such residence be continued beyond that time, such person shall be free.”
Such was and had always been the law of this state, down to the year 1841. The legislature of that year passed an act amending the revised statutes, in the following words, viz. “ The 3d, 4th, 5th, 6th and 7th sections of title 7, chapter 20, of the 1st part of the revised statutes are hereby repealed.”
The 6th section of the revised statutes, and that alone, contained an exception which would have saved the slaves of the respondent from the operation of the first section. The legislature, by repealing that section, and leaving the 1st in full force, have, as regards the rights of these people and of their master, made them absolutely free; and that not merely by the legal effect of the repealing statute, but by the clear and deliberate intention of the legislature. It is impossible to make this more clear than it is by the mere language and evident objects of the two acts.
It was, however, insisted on the argument that the words “ imported, introduced, or brought into this state,” in the 1st section of the revised statutes, meant only “introduced or brought” for the purpose of remaining here. So they did undoubtedly when the revised statutes were passed, for an express exception followed in the 6th section giving that meaning to the 1st. And when the legislature afterward repealed the 6tli section, they entirely removed that meaning, leaving the first section, and intending to leave it, to mean what its own explicit and unreserved and unqualified language imports.
Not thinking myself called upon to treat this case as a casuist or legislator, I have endeavored to discharge my duty as a judge in internreting and applying the laws as I find them. *717 Did not the law seem to me so clear, I might feel greater regret, that I have been obliged to dispose so hastily of a case involving such important consequences.
My judgment is, that the eight colored persons mentioned in the writ be discharged.
There are two acts of congress bearing upon the questions in this case, and illustrating the views of congress, as to its power, under the constitution, over the introduction into any of the states, of free colored persons or slaves, brought from foreign countries, or transported coastwise from one state to another.
- The first is the act of 1803, ch. 10, entitled “An act to prevent the importation of certain persons into certain states, where, by the laws thereof, their admission is prohibited.” (2 U. S. Statutes at Large, 205.) This act forbids any master of a vessel, or other person, “ importing, or bringing any negro, mulatto, or other person of color, not being a native, a citizen, or registered seaman of the United States, or seamen natives of countries beyond the cape of Good Hope, into any port or place of the United States, which port or place shall be situated in any state, which, by law, has prohibited, or shall prohibit, the admission or importation of such negro, mulatto, or other person of color.”
The other act is the first law prohibiting the foreign slave trade (2 U. S. Statutes at Large, 426, sess. 2, ch. 22, 1801?). The title of the act is, “ an act to prohibit the importation of slaves, into any port or place within the jurisdiction of the United States, from and after the first day of January, in the year of our Lord 1808.” The reader must judge how far the following sections of this act, are in subordination to or independent of the general purpose of the act, as expressed in its title.
“Sec. 9. And be it further enacted, That the captain, master, or commander of any ship or vessel, of the burthen of forty tons or more, from and after the first day of January, one thousand eight hundred and eight,, sailing coastwise, from any port in the United States, to any port or place within the jurisdiction of the same, having on board apy negro, mulatto, or person of color, for the purpose of transporting them to be sold or disposed of as slaves, or to be held to service, or labor, shall, previous to the departure of such ship or vessel, make out and subscribe, duplicate manifests of every such negro, mulatto, or person of color, on board such ship or vessel, therein specifying the name and sex of each person, their age and stature, ns near as may be, and the class to which they respectively belong, whether negro, mulatto, or persons of color, with the name and place of residence, of every owner or shipper of the same, and shall deliver such manifests to the collector of the port, if there be one, otherwise to the surveyor, before whom the captain, master, or commander, together whh the owner, or shipper, shall severally swear or affirm, to the best of their knowledge and belief, that the persons therein specified were not imported, or brought into the United States, from and after the first day of January, one thousand eight hundred and eight, and that under the laws of the state, they are held to service or labor: Whereupon the said collector or surveyor shall certify the same, on the said manifests. one of which he shall return to the said captain, master, or commander, with a permit, specifying thereon the number, names, and general description of such persons, and authorizing him to proceed to the port of destination. And if *718 any ship, or vessel, being laden and destined as aforesaid, shall depart from the port where she may then be, without the captain, master, or commander, having first made out and subscribed duplicate manifests, of every negro, mulatto, and person of color, on hoard such ship or vessel as aforesaid, and without having previously delivered the same to the said collector, or surveyor, and obtained a permit, in manner as herein required, or shall, previous to her arrival at the port of her destination, take on board any negro, mulatto, or person of color, other than those specified in the manifests, as aforesaid, every sucli ship or vessel, together with her tackle, apparel, and furniture, shall be forfeited to the use of the United States, and may be seized, prosecuted, and condemned, in any court of the United States, having jurisdiction thereof: and the captain, master, or commander .of every such ship or vessel, shall moreover, forfeit for every such negro, mulatto, or person of color, so transported, or taken on board, contrary to the provisions of this act, the sum of one thousand dollars, one moiety thereof to the United States, and the other moiety to the use of any person, or persons, who shall sue for, and prosecute the same to effect.”
“Sec. 10. And be it further enacted, That the captain, master, or commander, of every ship or vessel, of the burthen of forty tons or more, from and after the first day of January, one thousand eight hundred and eight, sailing coastwise, and having on board any negro, mulatto, or person of color, to sell or dispose of as slaves, or to be held to service or labor, and arriving in any port within the jurisdiction of the United States, from any other port within the same, shall, previous to the unlading or putting on shore, any of the persons aforesaid, or suffering them to go on shore, deliver to the collector, if there be one, or if not, to the surveyor residing at the port of her arrival, the manifest certified by the collector, or surveyor of the port, from whence she sailed, as herein before directed, to the truth of which, before such officer, he shall swear or affirm ; and if the collector or surveyor shall be satisfied therewith, he .shall thereupon grant a permit forunlading or suffering such negro, mulatto, or person of color, to be put on shore, and if the captain, master, or commander of any sueli ship or vessel being laden as aforesaid, shall neglect or refuse to deliver the manifest, at the time, and in the manner herein directed, or shall land or put on shore, any negro, mulatto, or person of color, for the purpose aforesaid, before he shall have delivered his manifest, as aforesaid, and if obtained, a permit for that purpose, every such captain, master, or commander, shall forfeit and pay ten thousand dollars, one moiety thereof, to the United States, the other moiety to the use of any person or persons who shall sue for and prosecute the same to effect.
Note by the present Reporter.—Although the above ease was beard by Mr. Justice Paine, as a supreme court commissioner, not as a judge of the superior court, and was, therefore, decided by him without consultation with any of his brelhren, yet, the extreme importance of the questions of constitutional and of national law, which its discussion involved, seemed to the reporter to justify its exception from the general rule, which he holds himself bound to observe, namely, npt to .publish any decision, resting only upon the authority of a single judge.
As an appeal to the supreme court, from the jxidgment of Mr. Justice Paine, is now pending, it would be manifestly improper, to giv,e any intimation, as to the probable eoncixrrence or dissent, of his associates, had they been consulted.