JONATHAN LEMMON, plaintiff in error, *vs.* THE PEOPLE, *ex rel.* Louis Napoleon, defendant in error.

L., a citizen of Virginia, being the owner of eight slaves, arrived with them in a steamer, at New York, with the intention of transhipping them there for Texas, whither he was going to reside; and meaning to remain in New York only until a vessel could be procured, to continue their journey. The slaves were landed, and the next day were brought before the court by *habeas corpus. Held* that under the existing laws they were free, and were entitled to be discharged.

Comity does not require any state to extend any greater privileges to the citizens of another state than it grants to its own. As the state of New York does not allow its own citizens to bring a slave here, even *in transitu,* and to hold him as a slave, for any portion of time, it cannot be expected to allow the citizens of another state to do so. *Per* MITCHELL, P. J.

The clause of the constitution of the United States giving to congress power to regulate commerce with foreign nations and among the several states, and with the indian tribes, confers no power on congress to declare the *status* which any person shall sustain while in any state of the union.

This power belonged, originally, to each state, by virtue of its sovereign and independent character, and has never been surrendered. It is therefore retained by each state, and may be exercised as well in relation to persons *in transitu* as in relation to those remaining in the state.

The power to regulate commerce may be exercised over individuals as passengers, only while on the ocean, and until they come under state jurisdiction. It ceases when the voyage ends, and then the state laws control.

THIS is a writ of *certiorari* issued out of this court, for the purpose of reviewing an order made November 13, 1852, by the Hon. Elijah Paine, then a justice of the superior court of the city of New York, upon a habeas corpus allowed by him, to inquire touching the detention of eight colored persons, to wit: one man, two women and five children, Jonathan Lemmon, the plaintiff, having been served with said habeas corpus, made a return thereto, which stated that Juliet Lemmon, the plaintiff's wife, was and had been for several years a citizen and resident of the state of Virginia; that the said eight persons were her slaves, inherited and owned by her, and held to labor by her as her slaves in that state, under and by virtue of the laws thereof; that intending to go with her said slaves from Virginia to the state of Texas as an ulti-

Lemmon v. The People.

mate destination, she necessarily took passage with her said slaves on board a certain steamship called the City of Richmond, at Norfolk, in the state of Virginia, bound for the state of Texas aforesaid; that by the laws of Texas, she, the said Juliet, was and would be entitled to the said slaves and to their service or labor, in like manner as she was entitled to the same by the laws of Virginia; that she was compelled by necessity to touch or land at the harbor of New York, without remaining or intending to remain longer than necessary; that she did not bring the said slaves into the state of New York to remain therein, or in any manner or for any purpose whatever, except *in transitu* from the state of Virginia to the state of Texas as aforesaid, through the port or harbor of New York, on board of said steamship; that the said slaves so passing from Norfolk on board said steamship never touched, landed in, or came into the harbor of New York, except for the mere purpose of such passage as aforesaid; and that the said Juliet Lemmon was so on her way, *in transitu* as aforesaid, with the said eight slaves in her custody and possession when, on the 6th day of November, 1852, the said writ of habeas corpus was served upon her.

The relator demurred to the return, on the ground that the facts stated in it did not constitute a legal cause for the restraint of the liberty of the colored persons; and after argument, Justice Paine, by his final order, dated November 13, 1852, liberated them from Mrs. Lemmon's custody, and ordered them to be set at liberty. See the case below, 5 *Sand. S. C. R.* 681.

This method of review (by certiorari) is regulated by the revised statutes. (*Part 3, ch. 9, tit. 1, art. 2, § 69, &c.*)

*H. D. Lapaugh* and *C. O'Conor*, for the plaintiff in error. I. The ancient general or common law of this state authorized the holding of negroes as slaves therein. The judiciary never had any constitutional power to annul, repeal or set aside this law; and, consequently, it is only by force of some positive

enactment of the legislative authority, that one coming into our territory with such slaves in his lawful possession could suffer any loss or diminution of his title to them as his property.

II. The unconstitutional and revolutionary anti-slavery resolutions of April, 1857, cannot retroact so as to affect this case. Prior to that time, no legislative act of this state had ever declared, that to breathe our air or touch our soil should work emancipation, *ipso facto;* nor had any statute been enacted which, by its true interpretation, denied to our fellow citizens of other states an uninterrupted *transitus* through our territory with their negro slaves. (1.) Independently of the special injunctions and guaranties of the federal constitution, the comity between the states of the American union should be, and upon the true principles of inter-state jurisprudence is, of the most intimate and cordial kind. (2.) Inter-state comity, in its simplest form, awards a free transit to members of a friendly state with their families and rights. of property, without disturbance of their domestic relations. (*Curtis' Arg.* 18 *Pick.* 195, *and cases cited.* 5 *Sand.* 710. 4 *Scam.* 467, 468.) (3.) Whatever others may do, no American judge can pronounce slave property an exception to this rule, upon the general ground that slavery is immoral or unjust. Every American citizen is bound by the constitution of the United States to regard it as being free from any moral taint which could affect its claims to legal recognition and protection, so long as any state in the union shall uphold it. (4.) The words " imported, introduced, or brought *into* this state," in the statute, (2 *R. S. part* 1, *tit.* 7, §§ 1, 16,) unless extended in a manner violative of all the principles above contended for, and beyond their fair import, do not apply to the *transitus* of a slave in custody of his owner, an American citizen, quietly passing through this state on lawful occasion and without unnecessary delay.

III. The state of New York cannot restrain a citizen of the United States from peaceably passing through her territory with his slaves or other property, on a lawful visit to a state

Lemmon *v.* The People.

where slavery is allowed by law. (1.) Congress has power "to regulate commerce with foreign nations, and among the several states and with the indian tribes." (*Const. U. S., art.* 1, § 8, *subd.* 3.) (2.) This power is absolutely exclusive in congress, so that no state can constitutionally enact any regulation of commerce between the states, *whether congress has exercised the same power over* the matter in question or left it free. (*Passenger cases,* 7 *How. U. S. R.* 572. *Id.* 400, *per McLean, J. Id.* 410, 431, *per Wayne, J., and the Court. Id.* 455, *per McKinley, J. City of New York* v. *Miln,* 11 *Peters,* 158, 159, 156, *per Story, J.* 7 *Cushing,* 299, 317, *Sim's case, per Shaw, Ch. J.*) At all events, the states have not reserved the right to prohibit and thus destroy commerce or any portion of it. The proposition involved in this case is that a citizen of Virginia, in possession of his slave property, cannot pass through the navigable waters of a non-slaveholding state on board of a coasting steamer enrolled and licensed under the laws of congress, without having his vessel arrested under state law, and his property torn from him by force of Lord Mansfield's *obiter dictum* in *Somersett's case,* 2 *Hagg.* 107. (*Gibbons* v. *Ogden,* 9 *Wheaton,* 1. *Com.* v. *Fitzgerald,* 7 *Law Rep.* 381.) The case in 1 *Parker's Cr. Cas.* 69, (*In Re Kirk,*) cannot be upheld. The proposition cannot be maintained. Each state is required to give full faith and credit to the public acts of every other. (*Art.* 4, § 1.) To surrender to every other, fugitives from its justice, or from any personal duty. (*Art.* 4, § 2, *subd.* 2, 3.) No privilege or immunity belonging to a citizen of one state can be invaded by any other state. (*Id.* § 1.) Commerce between the states is placed under the exclusive control of congress. (*Art.* 1, § 8, *subd.* 3.) And congress itself is forbidden to impose any burthen on the external trade of a particular state, or to burthen or prefer it in any way. (*Const. art.* 1, § 8, *subd.* 2; § 9, *subd.* 5.) It seems to have been universally conceded until the present case, and, at all events, it is clear in law, that a citizen of any state in the union may

freely pass through an intermediate state to the territory of a third without sacrificing any of his rights. (18 *Pick*, 224, 5, *per Shaw, Ch. J. Willard* v. *People*, 4 *Scam.* 468, *per cur. Sewell's slaves*, 3 *Am. Jur.* 406, 7. 7 *How. U. S. R.* 461.) (3.) The word " commerce," as it is used in this constitutional grant of exclusive power to congress, includes the transportation of persons, and the whole subject of *intercourse* between our citizens of different states as well as between them and foreigners. Consequently, no state can impose duties, imposts or burthens of any kind, much less penal forfeitures, upon the citizens of other states for passing through her territories with their property, nor can any state interrupt or disturb them in such passage. (*Passenger cases*, 7 *Howard's U. S. R.* 572. *Id.* 401, 405, 407, *per McLean, J. Id.* 412, 413, 430, 432, 434, 435, *per Wayne, J., and by the court. Id.* 450, 451, *per Catron, J. Id.* 453, *per McKinley, J. Id.* 461 *to* 463, 4*th point*, 464, *per Grier, J. Groves* v. *Slaughter*, 15 *Peters*, 510, 511, 513, 515, 516, *in point as to slaves, per Baldwin, J. See Argt. of Mr. Clay*, 15 *Peters*, 489 ; *Mr. Webster*, 495 ; *R. .J Walker contra, appendix*, 48 *and onward. Gibbons* v. *Ogden*, 5 *Peters' Cond.* 567, *curia, per Marshall, J.*) (4.) This doctrine does not preclude a state from exercising absolute control over all trading of any kind within her borders ; nor from any precautionary regulations for the preservation of her citizens or their property from contact with any person or thing which might be dangerous or injurious to their health, morals or safety. (7 *How.* 402, 403, 406, 408, *per McLean, J. Id.* 417, 424, 426 *to* 428, *per Wayne, J. Id.* 457, *per Grier, J.* 14 *Peters*, 615, *per Baldwin, J.* 16 *id.* 625, *per Story, J.* 5 *How.* 569, 570, 571. *Gibbons* v. *Ogden*, 9 *Wheat.* 1. 5 *Peters' Cond.* 578.)

IV. The constitutional guaranty to " the citizens of each state" that they " shall be entitled to all privileges and immunities of citizens in the several states," (*art.* 4, § 2, *subd.* 1,) affords the citizen of any state, peacefully passing through another, a right to immunity from such disturbance as the

Lemmon *v*. The People.

plaintiff suffered from the order now under review. (1.) This section would lose much of its force and beneficial effect if it were construed to secure to the non-resident citizen in traveling through a state, only such "rights" as such state may allow to its own citizens. Its object was to exempt him from state power, not to subject him to it. (2.) The section is not to be thus narrowed. The constitution recognizes the legal character "citizen of the United States" as well as citizen of a particular state. (*Art.* 1, § 3, *subd.* 3; *art.* 2, § 1, *subd.* 5.) The latter term refers only to *domicil*, for every citizen of a particular state is a citizen of the United States. And the object of this section was to secure to the citizen, no matter in what state he might be domiciliated, the general privileges and immunities which, in the very nature of citizenship, as recognized and established by the federal constitution, belonged to that *status;* so that by no partial and adverse legislation of a state into which he might go as a stranger or a sojourner could he be deprived of them. It is a curb set upon state legislation, harmonizing with the provision which extends the ægis of the federal judiciary to the non-resident citizen in all controversies between him and the citizens of the state in which he may be temporarily placed. (*Const. art.* 3, § 2. *Per Curtis, J.*, 19 *How.* 580.) (3.) This section, like its brother in the judicial article, applies only to the stranger. The moment a citizen of Virginia, ceasing from his journey, sits down in the state of New York without the intent of leaving, or makes, in fact, any stay beyond the reasonable halt of a wayfarer, he becomes a citizen of New York, and relinquishes all benefit from these important guaranties of the federal constitution. (4.) By the comity of civilized nations, the stranger is allowed to pass through a friendly territory without molestation. Even belligerents are allowed to pass their armies over a friendly neutral territory. (*Vattel, b.* 3, *ch.* 7, §§ 119 *to* 127. *See Vattel, b.* 2, *ch.* 8, §§ 108 *to* 110; *ch.* 10, §§ 132 *to* 134.) The object of this section was to secure to the citizen of the United States all the general privileges and immunities of a

citizen of the United States, whilst temporarily and necessarily within a state other than that of his domicil. One of these is to be free from all burthens and taxation whatever, for, upon general principles, taxation is only imposed on residents or on dealings; another is to be free from local class legislation, for as a wayfarer he cannot be a member of any body of persons organized, governed or defined as a class under the state law. The words " privilege and immunity" are here used essentially, though perhaps not exclusively, in a passive sense. The object is not to compel states to give strangers the same "rights" which they award to their own citizens; but to exempt the stranger from burthens or obstructions of any kind. To stop his vessel or his carriage *in transitu* and carry off his negro servant—recognized as his property by the laws of his own state and the federal constitution—is a manifest invasion of his just " privileges and immunities."

V. The general doctrines of the court in Dred Scott's case must be maintained, their alleged novelty notwithstanding.

VI. It is highly fit that the court below should be corrected in the view which it has taken of this matter, since the doctrine laid down by it is inconsistent with the peace of this country and the rights of other states. (*Per Lord Stowell*, 1 *Dodson*, 99.)

*W. M. Evarts*, for the people. I. The writ of *habeas corpus* belongs of right to every person restrained of liberty within this state, under any pretense whatsoever, unless by certain judicial process of federal or state authority. (1 *R. S.* 563, § 21.) This right is absolute (1) against legislative invasion, and (2) against judicial discretion. (*Const. art* 1, § 4. 1 *R. S.* 565, § 31.) In behalf of a human being, restrained of liberty within this state, the writ, *by a legal necessity*, must issue. The office of the writ is to enlarge the person in whose behalf it issues, unless *legal cause* be shown for the restraint of liberty or its continuation; and enlargement of liberty, unless such cause to the contrary be shown, flows from the writ by

the same legal necessity that required the writ to be issued. (1 *R. S.* 567, § 39.)

II. The whole question in the case, then, is, does the relation of slave owner and slave, which subsisted in Virginia between Mrs. Lemmon and these persons while there, attend upon them while commorant within this state, in the course of travel from Virginia to Texas, so as to furnish "legal cause" for the restraint of liberty complained of, and so as to compel the authority and power of this state to sanction and maintain such restraint of liberty. (1.) Legal cause of restraint can be none other than an authority to maintain the restraint which has the force of law within this state. Nothing has, or can claim, the authority of law within this state, unless it proceeds, 1. From the sovereignty of the state, and is found in the constitution or statutes of the state, or in its unwritten common (or customary) law; or 2. From the federal government, whose constitution and statutes have the force of law within this state. So far as the *law of nations* has force within this state, and so far as "by comity" the *laws of other sovereignties* have force within this state, they derive their efficacy, not from their own vigor, but by administration as a part of the law of this state. (*Story's Confl. of Laws*, §§ 18, 20, 23, 25, 29, 33, 35, 37, 38. *Bank of Augusta* v. *Earle*, 13 *Peters*, 519, 589. *Dalrymple* v. *Dalrymple*, 2 *Hagg. Consist. R.* 59. *Dred Scott* v. *Sandford*, 19 *How.* 460, 1, 486, 7.) (2.) The constitution of the United States, and the federal statutes, give no law on the subject. The federal constitution, and legislation under it, have, in principle and theory, *no concern* with the domestic institutions, the social basis, the social relations, the civil conditions, which obtain within the several states. The actual exceptions are special and limited, and prove the rule. They are, 1. A reference to the civil conditions obtaining within the states to furnish an artificial enumeration of persons as the basis of federal representation and direct taxation distributively between the states. 2. A reference to the political rights of suffrage within the states, as, respectively,

supplying the basis of the federal suffrage therein. 3. A provision securing to the citizens of every state within every other the privileges and immunities (whatever they may be) accorded in each to its own citizens. 4. A provision preventing the laws or regulations of any state governing the civil condition of persons within it, from operating upon the condition of persons "held to service or labor in one state, under the laws thereof, escaping into another." (Const. U. S. art. 1, § 2, subd. 1 and 3; art. 4, § 2, subd. 1 and 3. Laws of slave states, and of free states, on slavery. Ex parte Simmons, 4 W. C. C. R. 396. Jones v. Van Zandt, 2 McLean, 597. Groves v. Slaughter, 15 Peters, 506, 508, 510. Prigg v. Penn, 16 id. 611, 612, 622, 623, 625. Strader v. Graham, 10 How. 82, 93. New York v. Miln, 11 Peters, 136. Dred Scott v. Sandford, 19 How. 452, per Ch. J.; Nelson J., 459, 461; Campbell, J., 508, 9, 516, 17.) None of these provisions, in terms or by any intendment, support the right of the slave owner in his own state or in any other state, except the last. This, by its terms, is limited to its special case, and necessarily excludes federal intervention in every other. (3.) The common law of this state permits the existence of slavery in no case within its limits. (Const. art. 1, § 17. Somersett's case, 20 How. St. Trials, 79. Knight v. Wedderburn, id. § 2. Forbes v. Cochrane, 2 B. & C. 448. Shanley v. Harvey, 2 Eden, 126. The Slave Grace, 2 Hagg. Adm. 118, 104. Story's Confl. Laws, § 96. Co. Litt. 124 b. (4.) The statute law of this state effects an universal proscription and prohibition of the condition of slavery within the limits of the state. (1 R. S. 656, § 1; 659, § 16. 2 id. 664, § 28. Dred Scott v. Sandford, 19 How. 591–595. Laws of 1857, p. 797.)

III. It remains only to be considered whether, under the principles of the law of nations, as governing the intercourse of friendly states, and as adopted and incorporated into the administration of our municipal law, comity requires the recognition and support of the relation of slave owner and slave between strangers passing through our territory, notwithstand-

ing the absolute policy and comprehensive legislation which prohibit that relation and render the civil condition of slavery *impossible* in our own society. The *comity*, it is to be observed, under inquiry, is (1) of the *state* and not of the *court*, which latter has no authority to exercise comity in behalf of the state, but only a judicial power of determining whether the main policy and actual legislation of the state exhibit the comity inquired of; and (2) whether the comity extends to yielding the affirmative aid of the state to maintain the mastery of the slave owner and the subjection of the slave. (*Stor. Confl. Laws*, § 38. *Bank of Augusta* v. *Earle*, 13 *Pet.* 589. *Dred Scott* v. *Sandford*, 19 *How.* 591.) (1.) The principles, policy, sentiments, public reason and conscience, and authoritative will of the state sovereignty, as such, have been expressed in the most authentic form, and with the most distinct meaning, that slavery, whencesoever it comes, and by whatsover casual access, or for whatsoever transient stay, *shall not be tolerated upon our soil.* That the particular case of *slavery during transit* has not escaped the intent or effect of the legislation on the subject, appears in the express permission once accorded to it, and the subsequent abrogation of such permission. (1 *R. S. part* 1, *ch.* 20, *tit.* 7, §§ 6, 7. *Repealing act, Laws of* 1841, *ch.* 247.) Upon such a declaration of the principles and sentiments of the state, through its legislature, there is no opportunity or scope for judicial doubt or determination. (*Story's Confl. Laws*, §§ 36, 37, 23, 24. *Vattel, p.* 1, §§ 1, 2.) (2.) But, were such manifest enactment of the sovereign will in the premises wanting, as matter of general reason and universal authority, the *status* of slavery is never upheld in the case of strangers, resident or in transit, when the domestic laws reject and suppress such *status* as a civil condition or social relation. The same reasons of justice and policy which forbid the sanction of law and the aid of public force to the proscribed *status* among our own population, forbid them in the case of strangers within our territory. 2. The *status* of slavey is not a natural relation, but is contrary to nature, and

at every moment it subsists, it is an ever new and active vio-lation of the law of nature. (*Const. Virginia, Bill of Rights,* §§ 1, 14, 15.) It originates in mere predominance of physical force, and is continued by mere predominance of social force or municipal law. Whenever and wherever the physical force in the one stage, or the social force or municipal law in the other stage, fails, the *status* falls, for it has nothing to rest upon. To continue and defend the *status*, then, within our territory, the stranger must appeal to *some* municipal law. He has brought with him no system of municipal law to be a weapon and a shield to this *status;* he finds no such system here. His appeal to force against nature, to law against just-ice, is vain, and his captive is free. 3. The law of nations, built upon the law of nature, has adopted this same view of the *status* of slavery, as resting on force against right, and finding no support outside of the jurisdiction of the municipal law which establishes it. 4. A state proscribing the *status* of slavery in its domestic system, has no apparatus, either of law or of force, to maintain the relation between strangers. It has no code of the slave owner's rights or of the slave's submission, no processes for the enforcement of either, no rules of evidence or adjudication in the premises, no guard houses, prisons or whipping posts to uphold the slave owner's power and crush the slave's resistance. But a comity which should recognize a *status* that can subsist only by force, and yet refuse the force to sustain it, is illusory. If we recognize the fragment of slavery imported by the stranger, we must adopt the fabric of which it is a fragment and from which it derives its vitality. If the slave be eloigned by fraud or force, the owner must have replevin for him, or trover for his value. If a creditor obtain a foreign attachment against the slave owner, the sher-iff must seize and sell the slave. If the owner die, the sur-rogate must administer the slave as assets. If the slave give birth to offspring, we have a native born slave. If the owner, enforcing obedience to his caprices, maim or slay his slave, we must admit the *status* as a plea in bar to the public justice.

If the slave be tried for crime, upon his owner's complaint, the testimony of his fellow slaves must be excluded. If the slave be imprisoned or executed for crime, the value taken by the state must be made good to the owner, as for "private property taken for public use." Every thing or nothing, is the demand from our *comity;* every thing or nothing, must be our answer. 5. The rule of the law of nations which permits the transit of strangers and their property through a friendly state, does not require our laws to uphold the relation of slave owner and slave between strangers. By the law of nations, men are not the subject of property. By the law of nations, the municipal law, which makes men the subject of property, is limited with the power to enforce itself, that is, by its territorial jurisdiction. By the law of nations, then, the strangers stand upon our soil in their natural relations as men, their artificial relation being absolutely terminated. (*The Antelope,* 10 *Wheat.* 120, 121, *and cases ut supra.*) 6. The principle of the law of nations which attributes to the law of the domicil the power to fix the civil *status* of persons, does not require our laws to uphold, *within our own territory,* the relation of slave owner and slave, between strangers. The principle only requires us (1) to recognize the consequences in reference to subjects within our own jurisdiction, (so far as may be done without prejudice to domestic interests,) of the *status* existing abroad; and (2) where the *status* itself is brought within our limits and is here permissible as a domestic *status,* to recognize the foreign law as an authentic origin and support of the actual *status.* It is thus that *marriage* contracted in a foreign domicil, according to the municipal law there, will be maintained as a continuing marriage here, with such traits as belong to that relation here; yet, incestuous marriage or polygamy, lawful in the foreign domicil, cannot be held as a lawful continuing relation here. (*Story's Confl. Laws,* §§ 51, 51 *a,* 89, 113, 114, 96, 104, 620, 624.) (7.) This free and sovereign state, in determining to which of two external laws it will by *comity* add the vigor of its adoption and adminis-

tration within its territory, viz. a foreign municipal law of force against right, or the law of nations conformed to its own domestic policy under the same impulse which has purged its own system of the odious and violent injustice of slavery, will prefer the law of nations to the law of Virginia, and set the slave free.

*Impius et crudelis judicandus est, qui libertati non favet. Nostra jura* in omni casu *libertati dant favorem.* (*Co. Litt. ut supra.*)

*J. Blunt,* for the people. I. The state of slavery is contrary to natural right, and is not regarded with favor in any system of jurisprudence. All legal intendment is against it, and in favor of freedom.

II. The law of slavery is local, and does not operate beyond the territory of the state where it is established. When the slave is carried, or escapes beyond its jurisdiction, he becomes free, and the state to which he resorts is under no obligation to restore him, except by virtue of express stipulation. (*Grotius, lib.* 2, *ch.* 15, 5, 1; *Id. ch.* 10, 2, 1. *Wiquefort's Ambassador, lib.* 1, *p.* 418. *Bodin de Rep. lib.* 1, *cap.* 5. 4 *Martin,* 385. *Case of the Creole, and opinion in the House of Lords,* 1842, 1 *Phill. on International Law,* 316, 335.)

III. The provision in the federal constitution relating to fugitive slaves, recognizes this principle of universal jurisprudence, and imposes on the free states an obligation which is limited to fugitive slaves. If slaves were recognized as property under the constitution, this provision would be unnecessary. When this provision was under discussion, it was amended by striking out the word "legally" before "held to service;" because some thought slavery could not be legal in a moral point of view, and substituting "under the laws thereof." (*Jour. of Fed. Const.* 1787, *pp.* 306, 365, 384.) It was then deemed improper to admit in the constitution the idea that there could be property in men. (*Madison's Works,* 1429.) C. C. Pinckney, in speaking of this provision, says, "We have obtained a

Lemmon *v.* The People.

right to recover our slaves, in whatever part of America they may take refuge—which is a right we had not before." (16 *Peters*, 648.)

IV. The persons here claimed as slaves, are free by the express enactment of the legislature of this state. (1 *R. S. part* 1, *tit.* 656, 7, § 1.) "No person held as a slave shall be imported, introduced, or brought into this state, on any pretense whatever. Every such person shall be free." "Every person brought into this state as a slave shall be free." The exception originally made in favor of persons in transitu with their slaves, was repealed in 1841. (*Ch.* 247.) The right to declare and control the condition of its citizens is a right belonging to the states, and has not been conferred on the federal government. Otherwise, the whole power over slavery must be deemed within the control of congress.

V. They cannot be held by virtue of any provision of the constitution of the United States. The provisions cited on the argument, before Mr. Justice Paine, are : That relating to fugitives from justice. (*Art.* 4, § 2.) That full faith and credit shall be given in each state to the public acts of every other state. (*Art.* 4, § 1.) That the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states. (*Art.* 4, § 2.) That no citizen shall be deprived of life, liberty, or property, without due process of law. (*Art.* 5 *of Amendments.*) None of these provisions have any reference to this case. They are not fugitives escaping into this state from another state. We give full faith and credit to the act of Virginia, that made these persons slaves there. We allow the appellant all the privileges and immunities of a citizen of this state. He has not been deprived of property by these proceedings. The appellant had no property in these persons. It ceased to be property when he brought them into the state of New York. The constitution of the United States is a grant of powers to the general government. It follows, by necessary consequence, that what is not granted is reserved.

If there is no grant of power to enforce upon New York the obligation to allow a citizen of a slave state to bring his slaves here and retain them here as slaves, while sojourning or passing through this state, the general government has not the power; and the right to do so does not exist. New York having prohibited the act, no jurisdiction can declare her law unconstitutional. She has the right to reiterate the law of nature—to purge her soil of an evil that exists only in violation of natural right—to maintain, in practice as well as theory, the sacred rights of persons and personal liberty. Even in consenting to the reclamation of fugitives from service, she does not acknowledge the law of slavery. She agrees to ignore that question; and not to inquire into the nature of the duty of service, on the part of the fugitive, whether a slave or an apprentice; but to remit him to the courts of the state from which he fled. But this is the extent of her duty. Her bond extends no further than to the fugitive. As to all other persons, her laws protect their personal liberty against all claimants. It was not contemplated, at the formation of the constitution, that slavery was to be a permanent institution of the United States. It is inconsistent with the principle that lies at the foundation of our government. It is in contradiction to the declaration of independence, and to the preamble to the constitution. All the provisions of that instrument and contemporaneous history look to its ultimate extinction by the legislation and action of the state governments. (*See Emancipation acts of Vermont in* 1777; *New Hampshire,* 1783; *Rhode Island,* 1784; *Connecticut,* 1784; *New York,* 1799; *New Jersey,* 1804; *and Pennsylvania,* 1780; *Bill of rights of Massachusetts, and decision in James* v. *Lechmere, in* 1770, that slavery was illegal in that state; 2*d vol. Franklin's Works,* 517; *Madison's Works,* 1429; *Jefferson's Notes,* 152; *Washington's Will,* 1*st vol.* 569; *Helper's Crisis, pp.* 193, 224.) In incorporating the fugitive slave provision into the constitution, the convention was careful not to do any thing which should imply their sanction of slavery

as legal. The provision reported by the committee, September 12, 1787, read "legally held to service;" and it was amended September 15, by striking out "legally," so as to read "held to service under the laws thereof." (*See Journal,* 384, *and Madison, pp.* 1558, 1589.) The word "service" was substituted for "servitude," on motion of Edmund Randolph: the latter being descriptive of slaves, and the former of free persons. (3 *Mad.* 1569.)

VI. These persons are not to be held as slaves under any implied covenants between the states of the union, nor by any rule of comity. (1.) There is no implied obligation on the part of New York to allow a slave within her borders, in any form, or under any circumstances. The provision relating to the surrender of fugitives from service, is the only possible ease where such an obligation can arise. And by incorporating this provision in the constitution, every other case is excluded: *Expressio unius, exclusio alterius.* If the general right existed, and it was admitted that a slave of a slave state might still be held if escaping into or taken into a free state *in transitu,* the constitutional provision as to fugitives would be superfluous. (2.) No comity of states requires us to admit slavery into our state in any form. In extending comity towards the laws of other states, it is the state and not the court that establishes the rule. (*Chief Justice Taney in Augusta* v. *Earle,* 13 *Peters,* 589. *Grotius, lib.* 2, *ch.* 22, § 16.) There can be no such comity here, because the state has made an express statute declaring these persons to be free. Comity is not an obligation to be enforced by a superior, but a courtesy allowed by the party assuming the duty. In deciding whether comity requires any act, we look to our own laws and adjudication for authority. And it can never be exercised in violation of our laws. (*Story's Confl. of Laws,* §§ 23, 24, 36, 37. *Willard* v. *The People,* 4 *Scam.* 461. *Commonwealth* v. *Ayres,* 18 *Pick.* 221. 3 *Am. Jurist,* 404.) No comity requires us to allow an act here, by citizens of another state, that if done by our own citizens would be a felony. The

comity of nations is based upon principles that destroy all right to hold these persons as slaves. The laws of moral right—the recognition of personal liberty by the law of nations forbid it.

VII. These persons cannot be restrained of their liberty, whatever may have been their state in Virginia. If restrained of liberty here, it must be either under and by virtue of our laws, or under the laws of Virginia. The allegation of the suit is, that they were held and confined in a certain house in this city against their will. The answer is, they are slaves. Our laws prohibit any such holding. They furnish no remedy if the person claimed refuse to be detained. The question here is, can they be detained? Certainly not by our laws; and our courts can only administer our own laws. The laws of Virginia are not in force here. If the slave resists, how can he be compelled to subjection? If the master has not the power to enforce obedience, he cannot invoke the aid of law, for no law exists for such a case. It follows, that our laws, in this respect, if they remain neutral, leave the parties to their natural rights. This being so, the slave is free. Our authorities can only execute the laws of this state, and not those of another state.

VIII. They are free by the common law. (*Co. Litt.* 124 *b. Somersett's case,* 20 *Howell's State Trials,* 79. *Knight* v. *Wedderburn, id.* 2. *Forbes* v. *Cochrane,* 2 *Barn. & Cress.* 449. *Greenwood* v. *Curtis,* 6 *Mass. Rep.* 366. *Case of the Antelope,* 10 *Wheaton,* 420. *Jones* v. *Whealon,* 2 *McLean,* 596.) The English common law, as adjudicated before and since our revolution, adjudges them to be free. By the principles of the law of nations, as expounded by the philosophers and jurists of various countries, and recognized by all christendom, they are free. The constitution of the United States does not, by any express terms, deliver them to slavery. No implication can be drawn from any provision of that instrument, to remand them to slavery. The laws of this state declare them free. In behalf of their freedom, we urge the

Lemmon *v.* The People.

common jurisprudence of all nations; the principles of our own common law; the doctrines of the founders of our government; the legislation of our state; the public opinion of the world; and we deny, on the part of the people of the state of New York, that these persons, claimed as slaves, can be deemed such in our courts of justice.

*By the Court,* MITCHELL, P. J.   The act of the legislature of this state, passed in 1817, and re-enacted in parts in 1830, (1 *R. S.* 656,) declaring that "no person held as a slave shall be imported, introduced, or brought into this state on any pretense whatever, except in the cases thereinafter specified," and that "every such person shall be free," applies to this case.   The slaves in this case were brought from Virginia into this state, and remained here some short time: and although they were only brought here with a view to carry them from this state to Texas, they were (after the exceptions in that act were repealed by a subsequent act) within the prohibitions of that act; and are free if those acts be constitutional.   The addition made to the act, in the revised statutes of 1830, seems to have been intended to place this beyond doubt, (*see* § 16, *p.* 559;) it is, "Every person born within this state, whether white or colored, is FREE: every person who shall hereafter be born within this state, shall be FREE: and every person *brought* into this state as a slave, except as authorized by this title, shall be FREE."   One of the exceptions mentioned in that title allowed a person, not an inhabitant of this state, traveling to, or from, or passing through, this state, to bring his slave here and to take him away again; provided, that if the slave continued here more than nine months, he should be free.   Those exceptions are repealed by the act of 1841.

Comity does not require any state to extend any greater privileges to the citizens of another state than it grants to its own.   As this state does not allow its own citizens to bring a slave here even, *in transitu,* and to hold him as a slave for

any portion of time, it cannot be expected to allow the citizens of another state to do so.

Subdivision 1 of section 2 of article 4 of the constitution of the United States makes this measure of comity a right, but with the limitation above stated : it gives to the citizens of a sister state only the same privileges and immunities, in our state, which our laws give to our own citizens. It declares, that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." Subdivision 3 of that section is confined to the case of a person held to service or labor *escaping* from one state into another. It does not extend to the case of a person voluntarily brought by his master into another state for any period of time : it cannot by any rule of construction be extended to such a case. It is, "no person held to service or labor in one state, under the laws thereof, *escaping* into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor," &c.

The clause of the constitution giving to congress power "to regulate commerce with foreign nations and among the several states, and with the indian tribes," confers no power on congress to declare the *status* which any person shall sustain, while in any state of the union. This power belonged originally to each state, by virtue of it sovereign and independent character, and has never been surrendered. It has not been conferred on congress, or forbidden to the states, (unless in some provisions in favor of personal rights,) and is therefore retained by each state, and may be exercised as well in relation to persons *in transitu*, as in relation to those remaining in the state.

The power to regulate commerce may be exercised over persons as passengers, only while on the ocean and until they come under state jurisdiction. It ceases when the voyage ends, and then the state laws control.

This power to regulate commerce, it has been expressly declared by the supreme court of the United States, did not

Aikin *v.* Albany, Vermont and Canada R. R. Co.

prevent the state of Mississippi from prohibiting the importation of slaves into that state for the purposes of sale. The same court has held that goods when imported can (notwithstanding any state law) be *sold* by the importer in the original packages. It follows that the power to regulate commerce, confers on the United States some check on the state legislation as to goods or merchandise, after it is brought into the state, but none as to persons, after they arrive within such state.

If this could be regarded, in the case of the slave-holding states, as a police regulation, it may also be so regarded as to the free states. They consider (as the legislation of this state for many years has shown) that the holding of slaves in this state, for any purpose, is as injurious to our condition and to the public peace, as it is opposed to the sentiment of the people of this state.

The judgment or order below should be affirmed, with costs.

[NEW YORK GENERAL TERM, December 30, 1857. *Mitchell, Roosevelt* and *Peabody,* Justices. *Davies & Clerke J J. were also present. Roosevelt J. dissented. Errat* ...