## Case No. 10,595.

### OSBORN v. NICHOLSON et al.

[1 Dill. 219; 13 Int. Rev. Rec. 106; 6 Am. Law Rev. 572.][1]

Circuit Court, E. D. Arkansas. 1870.[2]

SLAVE CONTRACTS — EFFECT THEREON OF RECENT AMENDMENTS TO THE CONSTITUTION.

1. The institution of slavery under the constitution of the United States, was purely local in

its character, and confined to the several states where it existed, and was the creature of positive law, and this is true of all its incidents.

2. The constitution of the United States did not regard slaves as property, but as persons; and it did not establish slavery or give any sanction to it, save in the single respect of the return of fugitives from service.

3. A remedy on a contract which is against sound morals, natural justice, and right, may exist by virtue of the positive law under which the contract was made; but such remedy can only be enforced so long as that law remains in effect. As such remedy derives all its support from the statute, it cannot for any purpose survive its repeal.

[Cited in Buckner v. Street, Case No. 2,098.]

4. The new constitution of Arkansas, declaring that "all contracts for the sale and purchase of slaves were null and void," is not in conflict with the clause of the constitution of the United States prohibiting any state from passing any law impairing the obligation of contracts, which clause does not operate so as to perpetuate the institution of slavery or any of its incidents, these being matters over which the states had unlimited control.

5. The thirteenth amendment to the constitution of the United States ipso facto destroyed the institution of slavery and all of its incidents, and put an end to all remedies growing out of sales of slaves.

6. In view of the thirteenth and fourteenth amendments to the constitution of the United States, a remedy on a contract for the sale of slaves is contrary to the spirit of their provisions, against public policy, and cannot be maintained.

[Cited in Buckner v. Street, Case No. 2,098.]

On the 28th of March, 1861, the defendant [Young A. G. Nicholson] executed to the plaintiff [Henry T. Osborn] his promissory note for $1,300, and at the same time the plaintiff executed to the defendant a bill of sale in these words: "For the consideration of thirteen hundred dollars, I hereby transfer all the right, title and interest I have to a negro boy named Albert, aged about twenty-three years. I warrant said negro to be sound in body and mind, and a slave for life. I also warrant title to said boy clear and perfect." The consideration for the note was the negro boy mentioned in the bill of sale, and this suit is founded on this note. To the plea setting up these facts, and the subsequent emancipation of the slave by the abolishment of slavery the plaintiff has demurred, and the question is thus raised whether the plaintiff can recover on a promissory note the sole consideration for which was a slave.

Garland & Nash, for plaintiff.
Watkins & Rose, for defendant.

CALDWELL, District Judge. On the part of the plaintiff it is claimed that at the date of this contract, slaves were property; that they were so recognized by the constitution of the United States, and the constitution and laws of this state, where the contract was entered into, and that the subsequent abolition of slavery by the thirteenth amendment of the constitution of the United States and the provisions of section fourteen, article fifteen of the constitution of this state, could

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission. 6 Am. Law Rev. 572, contains only a partial report.]
[2] [Reversed in 13 Wall. (80 U. S.) 654.]

not affect the vested rights of the plaintiff under the former law.

This is believed to be a full and fair statement of the grounds upon which the right of recovery is rested in this class of cases. It is assumed that there was not when this contract was entered into, and is not now, as to contracts entered into before slavery was abolished, any distinction between a contract the consideration for which was slaves, and a contract made upon any other consideration.

This is the fatal vice in the argument of those who maintain the continued validity of these contracts. The general rules they lay down with reference to vested rights and the effect of a repeal of a statute upon transactions already concluded, may be sound law, and furnish a rule of decision in cases where they apply, but like most general rules of law, they are subject to exceptions and qualifications. And that they have no application to the extent claimed to this case, can be demonstrated by a chain of authorities that no court is at liberty to disregard.

It is obvious that this question cannot be determined without an inquiry into the nature and incidents of slavery, and the relation which the national government sustained, and now sustains to that institution. That slavery is against the law of God and the law of nature, that slaves were regarded as persons and not property by the constitution of the United States, that it was only within the slave states they were regarded as property, that this status was stamped upon them by the local laws of those states and limited to their territorial operation, and that those laws, though expressed in the form of written constitutions and statutes, had in their origin no higher or better sanction than brute force, and were constantly held, even by the courts that enforced them, to be contrary to natural right are propositions established by the judgments of courts and opinions of jurists, whose judgments and opinions must be held to be conclusive upon every court having a decent respect for judicial precedent and authority.

I had supposed that no one denied that these propositions were sound law, but their soundness having been questioned by some judges who maintain that it is still obligatory on the courts to afford a remedy to the slave trader on his slave contracts, a brief reference to the authorities supporting them would seem to be called for.

In 1771, a slave named Somerset was taken by his master from Virginia, then a British colony, to England, and on the refusal of the slave to return with his master to Virginia, he was sent on board of a ship to be carried to Jamaica and sold as a slave. A habeas corpus was granted against the captain of the ship to bring up the body of Somerset, who was in his possession, in irons, and show the cause of his detention. The case was heard before the king's bench, and in giving the opinion of the court, Lord Mans-field said: "The state of slavery is of such a nature that it is incapable of being introduced on any reasons, moral or political, but only by positive law. * * * It is so odious that nothing can support it but positive law." And the court held that the relation of master and slave would not be recognized in any country where slavery did not exist, and that the moment a slave got beyond the operation of the local law which condemned him to slavery, he was free. This decision, pronounced a century ago, has remained the law of England. It was re-affirmed with emphasis in 1824, by the court of queen's bench.

A British merchant residing in Florida, when it was a Spanish province, and slavery existed there, owned certain slaves, who escaped and went on board a British vessel lying off the coast of Florida. The master of the slaves pursued them and demanded their return from the officer in the immediate command of the vessel. That officer refused to return the slaves, or to compel them to leave the ship, and the owner afterwards brought suit against him in England for the value of the slaves. Holroyd, J., in the course of his opinion, says: "Now it appears from the facts of the case, that the plaintiff had no right in these persons except in their character of slaves, for they were not serving him under any contract, and according to the principles of the English law, such a right cannot be considered as warranted by the general law of nature. I am of opinion that according to the principles of the English law, the right to slaves, even in the country where such rights are recognized by law, must be considered as founded not upon the law of nature, but upon the particular law of that country." And in the same case, Chief Justice Best says: "The moment they put their feet on board of a British man-of-war, not lying within the waters of East Florida (where undoubtedly the laws of the country would prevail) those persons who before had been slaves, were free."

It was urged in this case that the plaintiff was a British subject, that the slaves carried off by the defendant were property according to the law prevailing in Florida, and that though slavery might not exist in England, the comity of nations required that the courts of that country should afford him redress for the loss of his property. In answer to this claim, the same learned judge says: "The plaintiff, therefore, must recover here upon what is called the comitas inter communitates, but it is a maxim that that cannot prevail in any case where it violates the law of our country, the law of nature, or the law of God." And the court, holding that slavery was contrary to the law of nature and the law of God, the defendant had judgment. Forbes v. Cockburn, 2 Barn. & C. 448, 9 E. C. L. 199.

In Phillimore's International Law, a work of undoubted authority, it is said: "There is a kind of property which it is equally unlaw-

ful for states as for individuals to possess—property in men. A being endowed with will, intellect, passion, and conscience, cannot be acquired and alienated, bought and sold by his fellow beings like an inanimate, or an unreflecting and irresponsible thing. The Christian world has slowly but irrevocably arrived at the attainment of this great truth, and its sound has at last gone out into all lands, and its voice into the ends of the world. By general practice, by treaties, by the laws and ordinances of enlightened states, as well as by the immutable laws of eternal justice, it is now indelibly branded as a legal as well as a natural crime." Again he says: "If the movable property of the subjects of a state finds its way within the limits and jurisdiction of a foreign state, it may be claimed, and must be restored to the lawful owners. In parts of the American continent, slaves are unhappily by municipal law, considered as chattels or movable property; a slave escapes, or arrives in this country where slavery is illegal, he is claimed by his master,—must he be restored? Unquestionably not; upon what grounds? Upon the grounds that the status of slavery is contrary both to good morals and to fundamental policy." 1 Phillim. Int. Law, 242, 316, et seq.

The doctrine established by the English cases, is also the law of France. 1 Phillim. Int. Law, 258, 341. And it has been recognized by the courts of this country to its fullest extent.

In the case of Rankin v. Lydia, Judge Mills, speaking for the court of appeals of Kentucky, says: "In deciding the question (of slavery), we disclaim the influence of the general principles of liberty, which we all admit, and conceive it ought to be decided by the law as it is, and not as it ought to be. Slavery is sanctioned by the laws of this state, and the right to hold slaves under our municipal regulations is unquestionable. But we view this as a right existing by positive law, of a municipal character, without foundation in the law of nature, or the unwritten and common law." 2 A. K. Marsh. 468.

In the case of The Antelope, 10 Wheat. [23 U. S.] 12, Chief Justice Marshall says: "That it (slavery) is contrary to the law of nature will scarcely be denied. That every man has a natural right to the fruits of his own labor, is generally admitted, and that no other person can rightfully deprive him of those fruits and appropriate them against his will, seems to be the necessary result of the admission."

In Dred Scott v. Sandford, 19 How. [60 U. S.] 624, Mr. Justice Curtis says: "Slavery being contrary to natural right, is created only by municipal law. This is not only plain in itself, and agreed by all writers on the subject, but it is inferable from the constitution, and has been explicitly declared by this court. The constitution refers to slaves as 'persons held to service in one

state, under the laws thereof.'" Nothing can more clearly describe a status created by municipal law.

In Prigg v. Pennsylvania, 10 Pet. [35 U. S.] 611, this court said: "The state of slavery is deemed to be a mere municipal regulation founded on, and limited to, the range of territorial law." And in the same case, Mr. Justice McLean says: "The civil law throughout the continent of Europe, it is believed, without an exception, is that slavery can exist only within the territory where it is established; and that if a slave escapes, or is carried beyond such territory, his master cannot reclaim him, unless by virtue of some express stipulation." Id. 634. And the same learned judge, in speaking of the relation which the national government bore to slavery in the states, says: "Slavery is emphatically a state institution." And in answer to the suggestion that section nine of the state constitution that provides "that the migration or transportation of such persons as any of the states now existing shall think proper to admit, shall not be prohibited by congress prior to the year 1808," was a constitutional recognition of the nationality of slavery, he says: "The provision shows clearly that congress considered slavery a state institution, to be continued and regulated by its individual sovereignty, and to conciliate that interest the slave trade was continued twenty years, not as a general measure, but for the 'benefit of such states as shall think proper to encourage it.'" Two years before the expiration of the time allowed for the continuation of the slave trade had expired, Mr. Jefferson, in his message to congress, used this language: "I congratulate you, fellow citizens, on the approach of a period at which you may interpose your authority, constitutionally, to withdraw the citizens of the United States from all participation in the violation of human rights, which has been so long continued on the unoffending inhabitants of Africa, and which the morality, the reputation and the best interests of the country have long been eager to proscribe. Although no law you can pass can take the prohibitory effect until the first day of the year 1808, yet the intervening period is not too long to prevent by timely notice, expeditions which cannot be completed before that day." [Message of President Jefferson to the Ninth Congress, 1806.] [3]

And no sooner had the right reserved by the slave states to continue this infamous traffic expired, than congress passed an act declaring the slave trade piracy, to be punished with death. And it was only by virtue of the third section of article 4 of the constitution of the United States, that fugitive slaves could be apprehended in the free states and returned to their masters.

And this provision of the constitution was

[3] [From 13 Int. Rev. Rec. 107.]

limited strictly to the case of a person "escaping," and hence the courts uniformly held that if a master voluntarily permitted his slave to go into a free state, or attempted to travel with his slave through a free state, the slave was a free man the moment he entered the free state. Com. v. Aves, 18 Pick. 193; Lemmon v. People, 26 Barb. 270; People v. Lemmon, 5 Sandf. 681. 20 N. Y. 562; Dred Scott v. Sandford [supra], opinions of Justices McLean and Curtis, and cases there cited; Jones v. Van Zandt [Case No. 7,501]; Forsyth v. Nash, 4 Mart. (La.) 385; Ex parte Simmons [Case No. 12,863].

That slavery existed in the states independent of the constitution, must be admitted, but that that instrument gave any sanction to slave contracts, or that slavery derived any support from that instrument, save in the single particular already mentioned, is not true; and that it was contrary to the genius and spirit of our institutions and the fundamental principle upon which our government was founded, will scarcely be denied.

We know that the states might destroy property in slaves, without compensation, by repealing the laws by which slavery was established, and we have seen that the right of property in slaves was lost the moment they were taken beyond the territorial operation of the laws that made them such. Now this was not, and is not, the case with any other species of property. No state could deprive its citizens of the right of property in their horses and cattle, without making compensation, and no state can deny to citizens of other states the right to bring such property, or any other species of property, with them, into such state. Crossing state lines does not affect the title to movable property of any kind. This right of every citizen to dwell in or pass through any state in the union, with his movable property, is guaranteed by the constitution of the United States, and exists by the law of nations. But no such right obtained by the constitution of the United States, or the law of nations, with reference to slaves.

The right to movable property, and the rights growing out of contracts in reference to such property, are recognized and upheld by the common law of nations. But this code of universal obligation, securing to the owner his movable property in every state, and securing to all the rights growing out of contracts in reference to such property, has no application to slavery, and the rights growing out of it.

The comity of states and nations does not demand the enforcement of slave contracts any more than it demands the recognition of the claim of the master to his slave, and the law of nations, and the common law, deny all remedy on contracts and rights claimed by virtue of the slave code, in courts of free states. Forbes v. Cochrane, 2 Barn. & C. 448; Story. Confl. Laws, §§ 96, 242, 244,

259; Greenwood v. Curtis, 6 Mass. 361, opinion of Judge Sedgwick; Sedg. St. & Const. Law, 72, 73, 88, and note.

A contract growing out of the sale of slaves depends for its force and validity on the laws of the state where it is made, and to be performed. In this respect it is not different from other contracts, but here the analogy ceases.

A slave contract may be valid by the laws of the state where it is made, and while those laws continue it may be enforced, but there is no obligation resting on any free state to afford a remedy on such contracts. Nor was any such obligation imposed on the free states by the constitution of the United States. In Com. v. Aves, supra, there is an obiter dictum to the contrary. But this dictum is referred to by Judge Story, in note 5 to section 259, of his Conflict of Laws, in language that does not indicate approval; and it is in conflict with the text of that author, and the learned opinion of Judge Sedgwick in Greenwood v. Curtis, 6 Mass. 361, and, see opinion of Justice Nelson [Dred Scott v. Sandford] 19 How. [60 U. S.] 459 et seq.

The constitutional inhibition against state laws impairing the obligation of contracts is not limited in its operation to laws impairing the obligation of contracts, made and to be performed within the state. The law of the contract,—the obligation of the contract,—remains the same, and will be the same everywhere and will be the same in every tribunal. But it does not follow that the constitution compels this state to enforce every species of contracts made in foreign states or other states of this Union, or in this state.

Neither the national nor the state courts will enforce contracts against good morals, or against religion, or against public right, nor contracts opposed to our national policy or national institutions. Such contracts will be deemed nullities by the courts of this country, although they may be deemed valid by the laws of the place where they are made. Story, Confl. Laws, §§ 244, 259, 326–328, 336, 337.

"The law of the place where the thing happens does not always prevail. In many countries a contract may be maintained by a courtesan for the price of her prostitution, and one may suppose an action to be brought here upon such a contract, which arose in such a country, but that would never be allowed in this country." Robinson v. Bland, 2 Burrows, 1084.

Now slavery contained in itself all the worst social evils, and the sale of female slaves for purposes of prostitution was only one of its many revolting features. Will any one be so bold as to affirm that a slave contract entered into in a foreign country, and valid by the laws of that country, would now be enforced by the courts of this country, either state or national? And if not,

why not? Obviously because such a contract is against sound morals, and natural right, and opposed to the constitution and policy of our government. Now is there any thing in our constitution and policy to-day by which the domestic slave trader is put in any better position before the courts of the country than the foreign slave trader would occupy?

It is said slavery was once lawful in some of the states of of the Union, and was tolerated by the constitution of the United States. Granted. But it has been abolished by the constitution of the United States, and of the several states, and that abolishment has been followed up by acts for the enfranchisement of the former slaves, and other legislation that indelibly stamp slavery and all contracts and rights based on the slave code as illegal and void.

In Lemmon v. People, 20 N. Y. 562, it was argued that the state of New York had once tolerated slavery, and that a simple abolishment of that institution by the state ought not to be held or construed to preclude a citizen of a slave state from passing through that state with his slaves. In answer to this argument the court says: "It cannot affect the question that at some time in her history, she has tolerated slavery. Without regard to time or circumstances, the state may at her will change the civil condition of her inhabitants, and her domestic policy, and proscribe and prohibit that which before had existed. Id. 617."

It is the status, the unjust and the unnatural relation which the policy of the state aims to suppress, and her policy fails, at least in part, if the status be upheld at all. Id. 630. If the slave code be now upheld and enforced for any purpose whatever; save as to matters "commenced, prosecuted, and concluded," whilst it was in force, do we not give effect to a policy opposed to the letter of our constitution and laws, and to their spirit and avowed policy? By the comity of nations we shall be forced to open our courts to the foreign, if we open them to the domestic, slave trader. We can open them to neither. In Greenwood v. Curtis, supra, Judge Sedgwick says: "If the contract on which a remedy is sought be unrighteous or immoral, either in its consideration or its stipulations, judgment must be rendered for the defendant, unless the court be concluded by positive authority operating in favor of the plaintiff." And this positive authority in such cases must be in force at the time the plaintiff seeks his judgment.

The plaintiff in this case is seeking to enforce in this court a contract growing out of the sale of slaves, after slavery has been abolished by the constitution of the United States, the slave code repealed, and such transactions made infamous and criminal by the laws of the land. It was only by virtue of the slave code of the state, that the plaintiff ever could have maintained an action in any court on this contract. The common law would afford him no remedy, and the statute giving the remedy, having been repealed by article 13 of amendments, of the constitution of the United States, he is without remedy.

In Key v. Goodwin, 4 Moore & P. 341, 351, Lord Chief Justice Tindal said: "I take the effect of a repealing statute to be to obliterate it as completely from the records of parliament as if it had never passed, and that it must be considered as a law that never existed, except for the purpose of those actions or suits which were commenced, prosecuted, and concluded whilst it was an existing law." In Surtees v. Ellison, 9 Barn. & C. 752, Lord Chief Justice Tenterden said: "It has long been established that when an act of parliament is repealed it must be considered (except as to transactions past and closed) as if it had never existed. That is the general rule, and we must not destroy that by indulging in conjecture as to the intention of the legislature. We are therefore to look at the statute, 6 Geo. IV. c. 16, as if it were the first that had ever been passed on the subject of bankruptcy." And in Dwar. St. 676, the rule is laid down in these words: "When an act of parliament is repealed, it must be considered, except as to those transactions passed and closed, as if it never existed." In Butler v. Palmer, 1 Hill, 324, 332, Mr. Justice Cowen, after quoting approvingly the rule laid down by Lord Chief Justice Tindal, in Key v. Goodwin, says: "It will be perceived that the rule laid down in this and several other cases, has no respect whatever to the circumstances that the repealed statute was either of a criminal or of a jurisdictional character. Nor is it perceived why in case of a civil right an exception is not just as practicable in favor of a jurisdiction given to enforce the right, as of the right itself." And see opinion of Justice Miller, in Steamship Co. v. Joliffe, 2 Wall. [69 U. S.] 163, and cases there cited.

While a remedy on a contract against sound morals and natural justice and right, may be given by the force of a positive law, under which it was made, and though an action may be maintained on such a contract while such law remains in force, no remedy can be given on such a contract after the repeal of the statute giving the same, and by virtue of which alone the contract ever had any validity.

The rule here laid down does not conflict with the doctrine of the supreme court in Steamship Co. v. Joliffe, supra. The distinction is between things lawful or indifferent, and things unlawful and immoral. Contracts authorized by a statute which are in themselves lawful, or at most indifferent, and which the parties might have lawfully entered into at common law, independent of the statute, and on which the common law would have afforded a remedy, may be en-

forced after the repeal of the statute under which they were made.

The common law in such cases affords a remedy. But if a statute recognizes the validity of, and gives a remedy to enforce, a contract which by the common consent of the whole civilized world is regarded as a violation of the law of God and the rights of man, the repeal of such a statute takes away all remedy on such contract.

It cannot be enforced under the statute because the statute is repealed, and the common law will not afford a remedy on such a contract. "It is an undoubted principle of the common law that it will not lend its aid to enforce a contract to do an act that is illegal, or which is inconsistent with sound morals or public policy; or which tends to corrupt or contaminate by improper influences, the integrity of our social or political institutions." Marshall v. Baltimore & O. R. Co., 16 How. [57 U. S.] 314, 334.

In Jones v. Van Zandt [Case No. 7,501] which was an action brought to recover the penalty given by the fugitive slave law, of 1793 [1 Stat. 302], for harboring and concealing a runaway slave. Mr. Justice McLean says: "It is clear the plaintiff has no common law right of action for the injury complained of. He must look exclusively to the constitution and act of congress for redress."

And where a penalty accrued under the same act, and suit was brought therefor, and was pending when that act was repealed, by the act of 16th September, 1850 [9 Stat. 462], the supreme court said: "As the plaintiff's right to recover depended entirely on the statute, its repeal deprived the court of jurisdiction over the subject matter." Norris v. Crocker, 13 How. [54 U. S.] 429.

In Kauffman v. Oliver, 10 Barr. [10 Pa. St.] 514, it was held that no action could be maintained at common law for harboring runaway slaves, or for aiding them to escape from their owners. And trover would not lie at common law for a negro slave, because by the common law it was said one man could not have a property in another, for men were not the subject of property.— 2 Kent, Comm. 283 et seq.

The law on this subject is forcibly and succinctly stated by Judge Curtis in his opinion in Dred Scott v. Sandford, 19 How. [60 U. S.] 625, in these words: "And not only must the status of slavery be created and measured by municipal law, but the rights, powers, and obligations which grow out of that status must be defined, protected, and enforced by such laws."

The rule here laid down is stated with great clearness by Justice Nelson, in Kimbro v. Colgate [Case No. 7,778]. By virtue of the fourth and fifth sections of the act of March 3, 1863, [12 Stat. 765], there accrued to the plaintiff a right of action to recover back certain sums of money paid by him to the defendant. After the money was paid and the right of action had accrued, the act giving the remedy was repealed. This was not an action for a penalty or forfeiture. To bring his case within the saving clause of the repealing statute, the plaintiff contended that it was a "proceeding to recover a sum of money in the nature of a penalty or forfeiture." In answer to this, the learned judge says: "I cannot, however, so regard it. The cause of action as stated in the declaration, is predicated upon a right to recover a sum of money paid by the plaintiff to the defendants; and for aught I see indebitatus assumpsit for money paid, would have been as appropriate a remedy as the special count to which the defendants have demurred." And on the point of the effect of the repeal of the statute, he says: "As the money was paid under a contract made in violation of law, there is no ground for the recovery of it back, upon the principles of common law; and, as the statute which gave the remedy has been repealed, the cause of action and the suit must, upon established principles, fall with the repeal."

Nor must it be forgotten that the repealing statute in this instance emanates from the highest power known in our form of government, and is part of the organic law of that government. Hence there can be no question of the constitutional power of repeal, and no objection urged, that the right did not reside with the power that effected the repeal to annihilate slavery and all its incidents, and all rights and obligations growing out of it.

The plaintiff's action must fail on another ground. The rule that a contract made and to be performed in a certain country derives its character and obligation from the laws of that country, is not better settled than that such contract may be dissolved by the laws of that country. And but for the limitation on the powers of the states in this respect, the states of the Union would have possessed the power to dissolve all contracts made and to be performed within their jurisdiction. But the limitation on the states in respect to this power is not absolute and universal in its application. States may pass insolvent laws under, and by virtue of which the obligation of contracts subsequently entered into and to be performed in such states, may be discharged.

And it is now the settled law that states may prescribe and declare by their laws respectively, what shall be the obligation of all contracts made within them. The contracts designed to be protected by the clause of the constitution in question, are, "contracts by which perfect rights—certain, definite, fixed private rights of property—are vested," and not those rights growing out of measures or institutions adopted, undertaken, or affected by the body politic, or state government for the benefit of all, and which from the very necessity of the case, and by common consent, are to be varied, discontinued, or created, as the public good shall require. In

such matters, this court has said that the extreme of abuse "would appear to exist in the arraignment of their control over officers and subordinates, in the regulation of their internal and exclusive polity, and over the modes and extent in which that polity should be varied to meet the exigencies of their peculiar condition. Such an abuse would prevent all action in the state governments, or refer the modes and details of their action to the tribunals and authorities of the federal government. These surely could never have been the legitimate purposes of the federal constitution." And it was held that the legislature might abridge the term of an officer without any conflict with the constitution of the United States. Butler v. Pennsylvania, 10 How. [51 U. S.] 416. So that it is far from being true that states are bound in all cases to enforce contracts made within them, according to the literal terms of such contracts.

And now let us inquire whether the constitution of the United States takes from a state the power to determine at any time the force and validity to be given to slave contracts made and to be performed in such state. Obviously if it shall be found on investigation that the constitution of the United States treated slaves as persons and not as property, and left the institution and traffic in slaves and all rights growing out of that traffic to the states themselves, giving no sanction to anything connected with the institution, excepting so far and so long as the states themselves gave that sanction, then such contracts and rights based on, or growing out of that institution, may be discharged by state laws, the same as though there was no inhibition on the states to pass laws impairing the obligation of contracts.

The power of congress to regulate commerce with foreign nations and among the several states, and with the Indian tribes (section 8, art. 1) is plenary and exclusive. This power extends to the carrying of persons as passengers, and to every species of property that may lawfully become the subject of traffic and commerce among men.

In 1832, the state of Mississippi adopted a constitution which prohibited the introduction of slaves into that "state as merchandise, or for sale."

In Groves v. Slaughter, 15 Pet. [40 U. S.] 449, it was contended by Mr. Webster that this provision of the constitution of Mississippi was in conflict with that provision of the constitution of the United States which confers on congress the power to regulate commerce between the states. And in his argument of that case he says: "The constitution recognizes slaves as property. The court is called upon to say that the state of Mississippi may prohibit the transportation into that state of any particular article. The court will be obliged to find out something in the introduction of slaves, different from trading in other property." And he contended that if the state of Mississippi could prohibit the introduction of slave property within her limits, Massachusetts might prohibit the introduction into that state, of cotton raised in Mississippi. Mark the answer given to this argument. Mr. Justice McLean speaking for a majority of the court says: "By the laws of certain states, slaves are treated as property, and the constitution of Mississippi prohibits their being brought into that state by citizens of other states, for sale, or as merchandise. Merchandise is a comprehensive term, and may include every article of traffic, whether foreign or domestic, which is properly embraced by a commercial regulation. But if slaves are considered in some of the states' as merchandise, that cannot divest them of the leading and controlling quality of persons, by which they are designated in the constitution. The character of property is given them by the local law. * * * Could Ohio, in her constitution, have prohibited the introduction into the state of the cotton of the South, or the manufactured articles of the North? If a state may exercise this power it may establish a non-intercourse with other states. This, no one will pretend, is within the power of a state. Such a measure would be repugnant to the constitution, and it would strike at the foundation of the Union. * * * But whilst Ohio could not proscribe the productions of the South, nor the fabrics of the North, no one doubts its power to prohibit slavery. * * * The power over slavery belongs to the states respectively. It is local in its character, and in its effects; and the transfer or sale of slaves cannot be separated from this power. It is, indeed, an essential part of it. Each state has a right to protect itself against the avarice and intrusion of the slave dealer; to guard its citizens against the inconveniences and dangers of a slave population." And Chief Justice Taney in the same case, says: "In my judgment the power over the subject (slavery) is exclusively with the several states."

The grant of power to congress to regulate commerce between states, extends to every species of property that may lawfully become the subject of traffic and commerce, and the grant is plenary and exclusive. Now if slave property was excepted from the operation of this power, on the ground that the power over that subject was exclusively with the several states, upon what principle of logic or rule of construction can it be claimed that the constitution of the United States throws its protecting shield over the slave dealer, and the contracts growing out of that traffic? Is not the grant of power to congress to regulate commerce between the states as full and absolute as the prohibition to the states to pass laws impairing the obligation of contracts? and if slave property is not embraced in the one case, neither are slave contracts embraced in the other; but both alike, are matters of state regulation.

In Jones v. Van Zandt, supra, Justice McLean says: "The constitution treats slaves as persons." The view of Mr. Madison, "who thought it wrong to admit in the constitution the idea that there could be property in men," seems to have been carried out in that most important instrument.

"In the provision respecting the slave trade, in fixing the ratio of representation, and providing for the reclamation of fugitives from labor, slaves were referred to as persons, and in no other respect are they considered in the constitution." Justice McLean, in Dred Scott v. Sandford, 19 How. [60 U. S.] 537. In the same case, Mr. Justice Nelson says: "Except in cases where the power is restrained by the constitution of the United States, the law of the state is supreme over the subject of slavery within its jurisdiction. * * * Whether, therefore, the state of Missouri will recognize or give effect to the laws of Illinois, within her territories, on the subject of slavery, is a question for her to determine. Nor is there any constitutional power in this government that can rightfully control her." Id. 459.

And this doctrine was carried to a great length in this case, as we shall see. Dr. Emerson, while the owner of Dred Scott, took him from Missouri to Wisconsin, where he at once became a free man, and was lawfully married, and children were there born of that marriage. Afterwards Scott was brought back within the state of Missouri, and the supreme court of that state, and a majority of the judges of the supreme court of the United States held that, under this state of facts, Scott was not entitled to his freedom, on the ground that slavery was purely a matter of state regulation, and that one state was not bound to give effect to the laws of another state, as to slavery, and that there was no constitutional power in the government of the United States to control a state in this regard. The effect of this holding was to dissolve a lawful marriage, and bastardize the legitimate issue of that marriage.

Against this result Justice Curtis protested with great energy. He said: "And I go further: in my opinion, a law of the state of Missouri, which should thus annul a marriage lawfully contracted by these parties, while resident in Wisconsin, not in fraud of any law of Missouri, or of any right of Dr. Emerson, who consented thereto, would be a law impairing the obligation of a contract, and within the prohibition of the constitution of the United States. * * * And the law does not enable Dr. Emerson, or any one claiming under him, to assert a title to married persons, as slaves, and thus destroy the obligation of the contract of marriage, and bastardize their issue, and reduce them to slavery." Id. 600, 601. But a majority of the court maintained that the right of the state of Missouri over the subject of slavery within her borders was supreme, thus in effect, holding that this right was paramount to the obligations of a marriage contract.

Now if this power of the states over the institution of slavery was so absolute and uncontrollable as to authorize them to destroy the obligation of the most sacred contract known in civil society, in the interest of slavery, it would be strange indeed, if they did not possess the power to annul slave contracts in the interests of freedom, humanity, and morality. It is a pleasing reflection to know that the law laid down in this celebrated case, and which was believed by many to be at variance with the rights of freedom, can now be quoted in support of, and is a full authority for, the "rights of the states" to abolish slavery, and obliterate all contracts relating to it.

These authorities abundantly establish the proposition that slavery was a local, and not a national institution, that the states possessed plenary powers over the whole subject, and all rights and obligations growing out of it—that it might be introduced or excluded, established or abolished, the introduction and sale of slaves from other slave states encouraged or prohibited, and the constitution of the United States had no bearing on the institution, and gave no validity to the traffic in slaves, or obligations growing out of that traffic, nor in any other manner recognized it, save in the single matter of returning those who should escape into free states. The fugitive slave law was passed to carry into effect this provision of the constitution, and with the passage of that act the constitutional power of the national government in the interest of slavery, or any right growing out of it, was exhausted.

This state in the exercise of her undoubted rights over the institution of slavery, and all its incidents, has by her constitution abolished the institution, and declared that "all contracts for the sale and purchase of slaves are null and void." Const. Ark. art. 15, § 14. This is the end of the plaintiff's case. Both parties to this contract must be held to have entered into it with the full knowledge of the plenary powers of the state over the subject matter of the contract.

In reference to contracts of sale, bills of sale, mortgages, and notes given for slaves, there was an implied condition attached to all such contracts, that the laws of the state that gave the right might also dissolve it. This was implied as fully as it is implied that the obligation of contract made and to be performed within a state may be discharged under the operation of an insolvent law of that state in force at the date of making such contract. Take the case of a mortgage upon slaves, and there were many, at the time slavery was abolished. A mortgage is a contract, and of as high an obligation as any other contract. Now what becomes of the obligation of such a contract after the state in which the mortgaged slaves were found abolished slavery?

Does the prohibition against impairing the obligation of contracts extend to such a case? Is the mortgage still valid and binding, and are the slaves embraced in it excepted from the operation of the constitutional provision abolishing slavery? It must be so, if that clause of the constitution was intended to protect and uphold, despite the action of the states, contracts and rights growing out of slavery. Again, take the case of a contract for the hire of slaves, or a contract for the sale and delivery of slaves at a future time, or a note, payable in slaves. What becomes of the obligation of the contract in all these cases? Obviously it is impaired, and if the position assumed is a sound one, the act of the state in abolishing slavery—as to the slaves embraced in such contracts—must be held unconstitutional and void, because the direct and inevitable effect of it would be in the cases supposed, to impair the obligation of contracts. Yet we know no such consideration would be admitted to control or limit the right of a state to deal with this institution.

It must not be forgotten that this question must be determined under the constitution of the United States, as it stands now. What are its provisions? "Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." Const. Amend. art. 13, § 1. "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." Id. art. 14, § 1.

Now, with such provisions in the constitution of a republic where every human being is free, would it not be a strange anomaly if there existed in that constitution a principle that would coerce the states to open their courts to the slave-dealer, and let him recover therein the fruits of his barbarous traffic? No such principle ever did exist in reference to such cases, but if there had been, it would have been repealed and superseded by the thirteenth and fourteenth amendments above quoted. These amendments are of paramount authority.

In Johnson v. Tompkins [Case No. 7,416], Mr. Justice Baldwin, after quoting the language of the constitution, that "This constitution and the laws which shall be made in pursuance thereof shall be the supreme law of the land," says, "An amendment to the constitution is of still higher authority, for it has the effect of controlling and repealing the express provisions of the constitution itself."

These amendments are the work of the sovereign people of the United States. There are no technical rules to obstruct or prevent their full operation presently on all persons, matters, and things within their scope. Obligation of contracts and vested rights, based on slavery, cannot be set up to impede or restrain their operation. And no one can escape from their operation by the cry of the "constitution as it was."

A court can only reply, that under the constitution as it is, slavery and slave contracts are outlawed, and that no clause of that instrument protects or upholds either. If the vicious principle contended for ever did lurk in the clause of the constitution relied upon, it has been extracted therefrom by these amendments.

While the prohibition on the states to pass laws impairing the obligation of contracts may not be restricted in its operation to contracts recognized to be of universal obligation, it is clear that it was never intended to sanction slavery, or operate to restrict or embarrass the powers of the states over that institution and its incidents. We have seen that its application to slave contracts would result in a prohibition upon the states from emancipating all slaves, when and so long as such slaves were held under mortgage, or other lien, arising out of a contract. For in a mortgage, the pledge of the property is the very essence of the contract, and the right to subject the property pledged to the payment of the mortgaged debt, is the obligation of that contract. More than half of the slaves of the south were thus pledged at all times, and if this clause can be invoked to uphold slave contracts, there never was a time when it might not have been successfully appealed to by the states to stay emancipation.

It may be hazardous to except any species of contract from the operation of that provision. I grant that it is; but it must be construed in the light of all other provisions of that instrument, and made to harmonize with them, and when so construed it cannot be held to be a prop to slavery and a shield to slave-traders. The fear expressed that this construction will tend to weaken the benign influence of this clause over the erratic and sometimes unjust action of states in their attempts to relieve themselves, or their citizens, from the obligation of their contracts, is not well founded. Slavery was emphatically sui generis, and the most astute lawyer will be unable to find its analogy under our constitution.

Let us next inquire as to the legal effect of these amendments on slave contracts, viewed independently of state enactments. These amendments were the result of the exercise by the people of the United States of their own proper and acknowledged sovereignty, for the purpose of restoring the

slaves to their natural rights, and conforming the institutions and laws of the republic and of the several states to the immutable laws of eternal justice, and making the fact conform to the theory upon which our form of government is based.

By these amendments a living force and vitality were imparted to the words of the declaration of independence, "that all men are created equal;" and to that clause of article 5 of the constitution of the United States, which declares that, "No person shall be * * * deprived of life, liberty, and property without due process of law."

The effect of these amendments cannot be limited to the mere severance of the legal relation of master and slave. They are far-reaching in their results. Under them the former slave is now a citizen, possessing and enjoying all the rights of other citizens of the republic. Can any one doubt that it was the object and purpose of these amendments to strike down slavery and all its incidents, and all rights of action based upon it?

Could it have been intended that free citizens should still be the subject matter of litigation in the courts of justice, as chattels? In the case before the court, as in most other cases of the sale of slaves, there is a warranty that the slave is sound in mind and body. If this court takes jurisdiction of this case, the defendant has a right to set up a breach of that warranty as a defense, and this court, in the trial of such an issue, must inquire into the mental and physical condition of a citizen of the republic, with a view of ascertaining his value as a chattel. And it may chance that the subject of this inquiry is a juror or officer of the court, and indeed it might occur that the judge on the bench would be the subject of such an inquiry. The mind revolts at the trial of such an issue. It would be giving full force and effect to one of the most obnoxious features of the slave code. It would be placing the free man, who may be the subject matter of such a suit, in an attitude before the court and the country that no free government will permit, jealous of the rights and honor of its citizens, and whose policy is to instil into their minds a love of country and its free institutions. The government that would permit its free citizens to be thus degraded in the interest of slavery and slave traders, would be unworthy of the name of a free republic.

The courts are daily in the habit of denying a remedy on contracts because they are against public policy. In such cases the good of the community at large is taken to be of more importance than the claim of the individual, and the latter must perish when it conflicts with the common welfare of society, in which that of the claimant is likewise involved. The courts, under such conditions, are often compelled to arbitrate between these opposing claims, without any distinct and articulate legislative rule; they must of their own knowledge decide whether public policy in the given case is materially affected, and give their judgment accordingly. In this case, however, the court is not under the necessity of resorting to its own knowledge of the tendency of the act in question. The thirteenth amendment carries with itself the denunciation of slavery in every form; and that as plainly as if the mischief to be remedied thereby had been expressly recited, and the tendency of slavery openly denounced. We may safely say that all the reasonable premises of the amendment are embraced by implication in its language; that it does in the same manner declare that slavery is unjust, and not for the best interest of the nation. As there is no exception, slavery is condemned in all its features. It is well known that among these, the sale of slaves, with the consequent breaking up of families, was considered as amongst the most odious. Is it possible, therefore, to hold that this, of the whole institution, alone survives the general destruction, and that the courts are still to guard this relic of a condemned system by adjusting the balance of justice between the buyer and seller under such painful and exasperating circumstances?—and this, when the evil policy of slavery, in all its parts and functions, has been so authoritatively declared? Whether this remedy were once good, by positive law, is no longer a pertinent question, when all the surroundings have been so changed as to have changed the fundamental law of the United States, and of every state where slavery was once tolerated. Public policy does necessarily change with the change of the conditions of society, which is no more an objection to this branch of the law than it is to any other. The law is not a set of dead rules, incapable of expansion or growth to meet the altered needs of society. The courts must pass on these questions as on practical affairs of life, vital in the actual present; and the courts will not stultify themselves by declining to adjudicate in reference to these, and to these alone; as was properly held in the great case of Egerton v. Earl Brownlow, 4 H. L. Cas. 1, 144, 196, 229, et seq. That a change in the fundamental law and policy of the government does necessarily operate to destroy the obligation of contracts and rights of action depending for their validity and enforcement on a law and policy inconsistent and incompatible with the last declared will of the sovereign power, has been expressly decided. While the state of Texas was a part of the territory of the republic of Mexico, that government granted certain lands in the state of Texas, and one of the conditions of the grant was, that the grantee should pay a certain sum to aid in the erection and maintenance of Roman Catholic churches, and the support of the clergy of that church who administered therein, the ceremonies of their religion; and this sum

was a charge upon the lands, and a burden that every grantee, by the terms of his grant, bound himself and his grantees to pay and discharge. The object and policy of the Mexican government in imposing this condition was to insure the support and maintenance of the Roman Catholic Church which was in some measure the established religion of the state.

Subsequently the state of Texas became an independent republic, but neither the constitution nor any law of the republic declared the condition in these grants void. But the constitution of the republic did declare that no religion should be established by law, and that every man should be free to worship God according to the dictates of his own conscience.

The question of the continued validity of the conditions in these grants came before the supreme court of Texas, and that court held the condition "was discharged by force of change of the governments effected by the revolution of 1836, and the principle of religious liberty incorporated into the organic law of the republic, by which freedom of conscience was secured, and religion was emancipated from the authority." Wheeler v. Moody, 9 Tex. 372, 376, and cases there cited. In the case cited there was no express declaration of the sovereign power that the condition in these grants should be void; the beneficiary was still in existence, and the conditions could as well be complied with under the one government as the other, but the court held that to enforce its performance would be giving force and effect to a principle opposed to the spirit and policy of the fundamental law, on the subject of religion.

The fundamental ground on which emancipation proceeded was, that the right of the slave to his freedom was paramount to the claim of his master to treat him as property; that slavery was founded in force and violence, and contrary to natural right; that no vested right of property or action could arise out of a relation thus created, and which was an ever new and active violation of the law of nature, and the inalienable rights of man, every moment that it subsisted.

The last clause of section 4, of article 14, declares that "neither the United States, nor any state, shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations, and claims, shall be held illegal and void."

This clause was not inserted to discharge the United States and the several states from any legal obligation to pay for slaves emancipated, for no such obligation had been incurred. It is a limitation on the discretionary power of the legislative departments of both governments to appropriate money for such purpose, independently of any legal obligation, and to prevent the agitation and disturbance that would result from leaving the question in that situation. The very language of the constitution itself is conclusive on the question.

The language is not that such claims shall not be paid, but that such claims "shall be held illegal and void." No court is at liberty to hold that a claim is just and legal that the constitution of the United States brands as "illegal and void." It is true this clause of the constitution does not in express words include the case of a claim by one citizen against another for the value of an emancipated slave; but the spirit of the constitution is to be respected no less than its letter.

And who can doubt that any claim for a slave, whether growing out of contract or otherwise, is within the spirit of this provision? If a claim against the United States for a slave emancipated by that government is illegal and void, how can the claim of one citizen against another for that same slave be held legal and valid? The constitution takes from A. slaves he purchased from B., and in answer to A.'s claim to be compensated for their value, says to him, "Your claim to these slaves was founded in force and violence, and their right to freedom was paramount to your right to treat them as property; your claim for compensation is, therefore, illegal and void."

Now, when B. claims from A. the price of these slaves, it is claimed that the same constitution says to him, "B.'s claim against you for these same slaves is legal and valid, and you must pay it." Such an interpretation would do violence to the whole spirit of the constitution, and it would be giving the high sanction of the constitution of the United States to a code of justice not much less a violation of right, reason, and justice than the slave code itself.

The clause in question is based on the broad principle that there shall be no further recognition by the national government or the states of the idea that there could lawfully be property in man. And this principle cuts its way through all vested rights and obligation of contracts based on slave codes, and operates with full force on claims and demands of every character originating in the idea that human beings were property, and the lawful subject of traffic.

This construction is in harmony with the spirit of our institutions, and is the necessary and logical result of the grounds upon which slavery was abolished without compensation to the slave owners. Let judgment be entered for the defendants on the demurrer.

The principles here announced are also conclusive of the case of Holmes v. Sevier [not reported], pending on the chancery side of this court, in which the same judgment is rendered.

Judgment for defendants.

[This case was carried by writ of error to the supreme court, where the judgment of this court was reversed. 13 Wall. (80 U. S.) 654.]